1  David E. Bower (SBN 119546)
2  **MONTEVERDE & ASSOCIATES PC**
   600 Corporate Pointe, Suite 1170
3  Culver City, CA 90230
   Tel: (213) 446-6652
4  Fax: (212) 202-7880

5  *Counsel for Plaintiffs*

6

7                    **UNITED STATES DISTRICT COURT**

8                    **NORTHERN DISTRICT OF CALIFORNIA**

9

10  BRIAN BAILEY and SCOTT FRANKLIN,       Civil Action No. 3:23-cv-1243
    Individually and on Behalf of All Others
11  Similarly Situated,                     **CLASS ACTION COMPLAINT**

12              Plaintiffs,                  1.  **Violation of Exchange Act §14(a) &**
                                                 **Rule 14a9 17CFR §244.100**
13       v.
                                             2.  **Violation of Exchange Act §20(a)**
14  ZENDESK,   INC.,   MIKKEL   SVANE,
    ARCHANA    AGRAWAL,   CARL   BASS,       **DEMAND FOR JURY TRIAL**
15  MICHAEL CURTIS, MICHAEL FRANDSEN,
    BRANDON   GAYLE,   STEVE   JOHNSON,      **VIOLATIONS OF THE SECURITIES**
16  HILARIE KOPLOW–MCADAMS, THOMAS           **EXCHANGE ACT OF 1934**
    SZKUTAK, and MICHELLE WILSON,
17
                Defendants.
18

19

20      Plaintiffs Brian Bailey and Scott Franklin (the "Plaintiffs"), by and through their

21  undersigned attorneys, bring this stockholder class action on behalf of themselves and all other

22  similarly situated former public stockholders of Zendesk, Inc. ("Zendesk" or the "Company")

23  against Zendesk and the former members of the Company's board of directors (the "Board," or the

24  "Individual Defendants," and together with Zendesk, the "Defendants"), for violations of Sections

25  14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a)

26  and 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9.

27

28

## NATURE OF THE ACTION

1.     Plaintiffs' claims arise in connection with the all-cash sale of Zendesk (the "Merger") to the affiliates of the funds advised by Hellman & Friedman LLC ("H&F") and Permira Advisers LLC ("Permira," and together with H&F, the "Consortium").

2.     On June 24, 2022, Zendesk, Zoro Bidco, Inc. ("Parent"), and Zoro Merger Sub, Inc. ("Merger Sub")[1], a direct wholly owned subsidiary of Parent, entered into the Agreement and Plan of Merger ("Merger Agreement"), whereby the Consortium would acquire Zendesk at a price of $77.50 in cash per share of Zendesk common stock owned (the "Merger Consideration").

3.     On August 8, 2022, Defendants solicited the Company's shareholders' approval of the unfair Merger by issuing a Definitive Proxy Statement (the "Proxy") with the U.S. Securities and Exchange Commission ("SEC") that contained the following materially false and misleading statements:

    i.     "Qatalyst Partners was advised by Zendesk management, and Qatalyst Partners assumed based on discussions with Zendesk management and the Board of Directors, that the June 2022 Case had been reasonably prepared on bases reflecting the best currently available estimates and judgements of Zendesk management of the future financial performance of Zendesk and other matters covered thereby." Proxy at 47.

    ii.     "Goldman Sachs assumed with the consent of the Board of Directors that the Forecasts were reasonably prepared on a basis reflecting the best then available estimates and judgements of Zendesk management." Proxy at 53.

    iii.     The implied values per share of Zendesk that the Company's financial advisors in connection with the Merger, Qatalyst Partners LP ("Qatalyst Partners") and Goldman Sachs & Co. LLC ("Goldman Sachs") calculated in support of their respective "fairness" opinions, using the downwardly manipulated June 2022 Case (the "Fairness Opinion Projections"). Proxy at 46-61.

---

[1] Parent and Merger Sub are the affiliates of the funds advised by the Consortium.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

4.     In March of 2022, the Company's management prepared a long-range plan for Zendesk through calendar year 2025 (the "Original March 2022 Case"), and then updated those projections in May of 2022 to create the March 2022 Case disclosed in the Proxy.  On June 22, 2022, management presented to the Board the downwardly-revised June 2022 Case, which the Board then approved for use by the Company's financial advisors in rendering their fairness opinions.  Notably, the June 2022 Case was prepared only *two days prior* to approval of the Merger Agreement by the Board.

5.     Indeed, in order to justify a Merger Consideration that they knew was inadequate, the Board (i) directed Company management to downwardly revise the March 2022 Case to create the unreasonably low Fairness Opinion Projections; and then (ii) ordered Qatalyst Partners and Goldman Sachs to utilize the unreasonably low Fairness Opinion Projections as the basis for their respective fairness opinions.  Thus, the three above material statements identified from the Proxy falsely represented the reasonableness of the Fairness Opinion Projections to the Company's shareholders, and misled Zendesk shareholders as to the fair value of their shares (discussed further herein).

6.     Moreover, in anticipation of the Merger, and *the day after* the Board approved the June 2022 Case, the Board ensured the beneficial treatment of their own equity awards by approving an equity-based retention program, pursuant to which certain executives were granted RSU Awards or Retention Grants.  Moreover, in connection with the Merger, the Compensation Committee of the Board approved an award of up to $30 million in *discretionary* bonuses to employees, including an aggregate of up to $7.5 million to certain executive officers.

7.     The special meeting of Zendesk shareholders to vote on the Merger was held on September 19, 2022 (the "Shareholder Vote"), and resulted in the Company's shareholders approving the Merger Agreement based upon the materially false and misleading Proxy.

8.     On November 22, 2022, the Merger was consummated, and pursuant to the terms of the Merger Agreement, Merger Sub merged with and into Zendesk, with Zendesk surviving the Merger as a wholly owned subsidiary of Parent. The consummation of the Merger caused Zendesk's shares to be cashed out and delisted from the NYSE, thereby denying shareholders the

1    ability to profit from the Company's future growth.

2        9.    For the foregoing reasons, and as set forth in further detail below, Plaintiffs seek to

3    recover damages from Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act.

4                        **JURISDICTION AND VENUE**

5        10.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange

6    Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as the Plaintiffs allege

7    violations of Section 14(a) and 20(a) of the Exchange Act.

8        11.    Personal jurisdiction exists over each Defendant. This Court has jurisdiction over

9    Zendesk because the Company has its principal place of business in the State of California. This

10   Court has jurisdiction over the Individual Defendants because each conducted business in or

11   maintained operations in this State at the times material hereto. Additionally, each Individual

12   Defendant committed violations of the Exchange Act within this State, and each has sufficient

13   minimum contacts with this District as to render the exercise of jurisdiction over the Defendants

14   by this Court permissible under traditional notions of fair play and substantial justice.

15       12.    Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C.

16   § 1391, because Defendants are found in or transact business in this District. Indeed, Zendesk's

17   principal executive offices were located in this District at 989 Market Street, San Francisco, CA

18   94103.

19                            **PARTIES**

20       13.    Plaintiff Brian Bailey was, at all relevant times, a shareholder of Zendesk.

21       14.    Plaintiff Scott Franklin was, at all relevant times, a shareholder of Zendesk.

22       15.    Defendant Zendesk, Inc. was a Delaware corporation with principal executive

23   offices located at 989 Market Street, San Francisco, CA 94103. Prior to the consummation of the

24   Merger, Zendesk's common stock traded on the NYSE under the ticker symbol "ZEN."

25       16.    Defendant Mikkel Svane was, at all relevant times, a director and the Chief

26   Executive Officer of Zendesk.

27       17.    Defendant Archana Agrawal was, at all relevant times, a director of Zendesk.

28       18.    Defendant Carl Bass was, at all relevant times, a director of Zendesk.

4

19.     Defendant Michael Curtis was, at all relevant times, a director of Zendesk.

20.     Defendant Michael Frandsen was, at all relevant times, a director of Zendesk.

21.     Defendant Brandon Gayle was, at all relevant times, a director of Zendesk.

22.     Defendant Steve Johnson was, at all relevant times, a director of Zendesk.

23.     Defendant Hilarie Koplow-McAdams was, at all relevant times, a director of Zendesk.

24.     Defendant Thomas Szkutak was, at all relevant times, a director of Zendesk.

25.     Defendant Michelle Wilson was, at all relevant times, a director of Zendesk.

26.     The Individual Defendants referred to in ¶¶ 16-25 are collectively referred to herein as the "Individual Defendants" or the "Board", and together with Zendesk, the "Defendants".

## CLASS ACTION ALLEGATIONS

27.     Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the other public stockholders of Zendesk (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

28.     This action is properly maintainable as a class action because:

(a)     The Class is so numerous that joinder of all members is impracticable. As of August 4, 2022, the record date to vote on the Merger, there were 61,732,943 shares of Zendesk common stock outstanding, held by hundreds to thousands of individuals and entities throughout the country. The actual number of former public stockholders of Zendesk will be ascertained through discovery;

(b)     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i.      whether Defendants have misrepresented or omitted material information concerning the Merger in the Proxy, in violation of Section 14(a) of the Exchange Act;

ii.    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii.   whether the Class suffered damages.

(c)   Plaintiffs are adequate representatives of the Class, have retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)   Plaintiffs' claims are typical of the claims of the other members of the Class, and Plaintiffs do not have any interests adverse to the Class;

(e)   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

(f)   Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g)   A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.    Zendesk's Background and Resilient Business Model, Strong Performance, and Substantial Prospects for Future Growth

29.    Zendesk was a service-first customer relationship management (CRM) company, built to give organizations of all sizes, in every industry, the ability to deliver a transparent, responsive and empowering customer experience. The Company's platform allowed organizations to deliver omnichannel customer service and customize and build apps across the customer journey. Zendesk evolved its offerings over time to product and platform solutions that worked together to help organizations understand the broader customer journey and improve communications across all channels.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

30.     The Company's platform solution offered a customizable front-end portal, live chat features and integration with applications like Salesforce and Google Analytics. Zendesk was used across a wide range of vertical markets including technology, government, media, and retail, from small to large.

31.     Zendesk's online customer portal helped support agents to keep track of tickets raised and their status. Customers went through existing tickets to find answers from queries similar to their question and if not satisfied, customers could raise their own tickets in the portal. Zendesk also offered branding of support pages with business logos, themes, and brand images.

32.     Much of Zendesk's success was attributed to its continuous innovation, building upon its market leadership on a global scale. This was most recently observed in the rapid growth of the Zendesk Suite product, solving the long-standing pricing and packaging friction that had stunted customer expansion, as well as the success in moving up-market into the enterprise – now a segment with more than $600 million ARR and growing about 50%.

33.     Prior to the Merger, the Company saw tremendous ten-year growth with around 100,000 customers in 150 countries. By the end of 2021, approximately 5,860 employees worked for the Company.

34.     Zendesk's strong financial performance leading up to the Merger positioned the Company to deliver long-term shareholder growth.

35.     In the Company's February 10, 2022, Q4 2021 Earnings Call, CEO Svane was clear that Zendesk's business model positioned the Company for success in the economic environment. He stated that "2021 was a great year for our business… [Zendesk] finished with a strong fourth quarter with revenue of $375 million. [Zendesk is] growing that 32% year-over-year. For the full year 2021, revenue grew 30% to $1.34 billion, exceeding the outlook that [Zendesk] gave at the start of the year."

36.     Additionally, according to Shelagh Glaser, Zendesk's CFO, the Company "generated $375 million in revenue this quarter, 32% year-over-year growth, which was ahead of our expectation. For the full year, revenue grew 30% to $1.34 billion, significantly better than the outlook we provided at the start of the year."

37.     In fact, on October 28, 2021, Zendesk announced its proposed acquisition of Momentive Global Inc. (the "Momentive Transaction"), revealing its capacity to expand.

38.     This success also continued into Q1 of 2022.  During the Q1 2022 Earnings Call on April 28, 2022, Defendant Svane was clear that Zendesk's business model positioned the Company for success.  According to Defendant Svane, Zendesk had a "record first quarter revenue of $388 million, growing 30% year-over-year and adding over $90 million of revenue compared to last year, *our largest ever one-year increase* for the first quarter. This also marked the fourth consecutive quarter that we have grown our builder business by more than 30%."

39.     Further emphasized by CFO Glaser, the Company was resilient in that it outperformed its initial expectations regarding free cash flow. At the Q4 2021 Earnings Call, she stated that free cash flow was expected to be "slightly negative in Q1 [of 2022]." However, Zendesk "outperformed this initial expectation and generated $1 million in positive free cash flow during the quarter, inclusive of $13 million in vendor payments related to the terminated acquisition." Glaser expected revenue to continue growing, with Q2 if 2022 revenue ranging between $402 million to $408 million."

40.     Moreover, Glaser stated that Zendesk's "first quarter non-GAAP gross margin was 82.6%, up 80 basis points year-over-year. Gross margin has continued to improve over time, driven largely by revenue scale and efficiencies in our hosting infrastructure."

41.     In light of this success in the first quarter of 2022, Glaser noted that Zendesk was "increasing [its] revenue guidance to $1.685 billion to $1.710 billion" and "increasing [its] full year free cash flow range to $175 million to $190 million."

42.     With regard to its customers, Defendant Svane stated that Zendesk grew its "headcount by 39% compared to the first quarter of last year, positioning us to deliver even stronger results for 2022 and beyond." According to CFO Glaser, Zendesk was "pleased with the progress with upmarket customers, as well as the initial data [they] are seeing from Suite customers." Furthermore, Glaser stated that "over the past six months, [Zendesk] increased the number of customers that are generating more than $1 million in ARR from 111 at the end of Q3, 2021, to 140 at the end of the first quarter, up 26% in just two quarters and 65% year-over-year."

43.     In further support of the Company's positive performance, Glaser stated that Zendesk was "pleased with [its] ability to onboard and retain talent, which will drive our growth plan. As we fully onboard these new employees and scale our business, we remain confident, committed with a clear line of sight to 7.5% non-GAAP operating margin, which is the guidance that we had originally introduced in the November Investor Meeting."

44.     Defendant Svane reiterated this optimism about the Company's prospects in Zendesk's June 9, 2022, press release, stating that:

> In response to investor input and our own self-assessments following the termination of our proposed acquisition of Momentive, our Board decided it was in the best interest of our stockholders to assess all opportunities to enhance stockholder value. The process did not yield any actionable options for Zendesk, and our Board unanimously determined that the right path to sustainably grow stockholder value lies in advancing Zendesk as an independent business.

> In addition, the Board and management believed that it was imperative for Zendesk to make this announcement to be transparent with our employees, customers, partners and investors regarding the execution and outcome of the strategic review, given the significant market speculation over the past several months. Our business is built on a strong foundation of delivering products that make it easier for businesses and customers to create better relationships. We remain as committed as ever to this and to serving all of our stakeholders.

45.     In sum, after record revenue production, repeated optimistic statements made by Defendant Svane and CFO Glaser in the Company's Q4 2021 and Q1 2022 Earnings Calls, and high analyst expectations, Zendesk shareholders had strong cause for optimism about the Company's ability to deliver a share price reflective of its expanding userbase, adaptable and resilient business model, and innovative technology. Yet, the Merger Consideration severely undervalued the Company.

## II.     Defendants Created and Approved the Unreasonably Low Fairness Opinion Projections to Justify the Unfair Merger Consideration

46.     The unreasonably low Fairness Opinion Projections were drastically reduced from the legitimately prepared March 2022 Case, which does not square with the Company's strong financial results and management optimism regarding Zendesk at the time (as outlined above).

47.     In March of 2022, the Company's management prepared the Original March 2022 Case, later updating it in May of 2022, resulting in creation of the March 2022 Case.  A summary of the March 2022 Case was disclosed in the Proxy as follows:

*March 2022 Case*
($ in millions)

|  | FY2022E | FY2023E | FY2024E | FY2025E | FY2026E | FY2027E | FY2028E | FY2029E | FY2030E | FY2031E |
|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | $1,715 | $2,172 | $2,743 | $3,423 | $4,255 | $5,255 | $6,453 | $7,872 | $9,549 | $11,507 |
| **Operating Income (non-GAAP)**[1] | $ 137 | $ 185 | $ 288 | $ 428 | $ 596 | $ 814 | $1,097 | $1,417 | $1,814 | $ 2,301 |
| **Unlevered Free Cash Flow**[2] | $ 217 | $ 260 | $ 384 | $ 545 | $ 747 | $ 998 | $1,314 | $1,672 | $2,109 | $ 2,640 |
| **Unlevered Free Cash Flow (Incl. SBC)**[3] | $ (66) | $ (88) | $ (41) | $ 31 | $ 109 | $ 262 | $ 476 | $ 727 | $1,059 | $ 1,489 |

48.     Then, on June 22, 2022, management presented the downwardly-revised June 2022 Case or the Fairness Opinion Projections (as shown below) to the Board, which was approved by the Board that same day for use by Qatalyst Partners and Goldman Sachs in rendering their respective fairness opinions. However, the Proxy entirely omitted any information that explained or justified management's significant reduction of the March 2022 Case to create the June 2022 Case.

*June 2022 Case*
($ in millions)

|  | FY2022E | FY2023E | FY2024E | FY2025E | FY2026E | FY2027E | FY2028E | FY2029E | FY2030E | FY2031E |
|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | $1,674 | $1,961 | $2,363 | $2,881 | $3,483 | $4,176 | $4,965 | $5,854 | $6,844 | $7,932 |
| **Operating Income (non-GAAP)**[1] | $ 138 | $ 167 | $ 248 | $ 360 | $ 488 | $ 647 | $ 844 | $1,054 | $1,300 | $1,586 |
| **Unlevered Free Cash Flow**[2] | $ 216 | $ 249 | $ 345 | $ 472 | $ 629 | $ 815 | $1,039 | $1,278 | $1,556 | $1,875 |
| **Unlevered Free Cash Flow (Incl. SBC)**[3] | $ (60) | $ (65) | $ (21) | $ 40 | $ 106 | $ 230 | $ 394 | $ 576 | $ 803 | $1,082 |

49.     As evinced by the tables above, the June 2022 Case was far more conservative than the March 2022 Case. Indeed, the downward revision of the Company's projected Unlevered Free Cash Flows from the March 2022 Case to the June 2022 Case had the effect of directly reducing the Company's implied equity value under the discounted cash flow analysis – the most

important valuation method Qatalyst Partners and Goldman Sachs used to value the Company.[2][3][4] As the technique's name suggests, a discounted cash flow analysis calculates the value of a business based upon the present value of the business's projected future free cash flows.

50.    Due to the method's operation, a discounted cash flow analysis is acutely sensitive to small differences in the underlying financial inputs affecting a Company's projected future cash flows, particularly to the extent these inputs alter the growth rate of projected cash flows. As explained by a highly respected professor with expertise in the study of M&A transactions:

> [A] discounted cash flow analysis is conducted by discounting back at a chosen discount rate the projected future free cash flows and terminal value of an asset. In performing this analysis there are three central choices, which must be made, each of which can significantly affect the final valuation.   These are the correct forecasted free cash flows to utilize, the appropriate discount rate, and the terminal value of the asset. There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. […]

> This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.[5]

51.    Here, the severe reductions to Zendesk's Unlevered Free Cash Flow projections from the March 2022 Case to the June 2022 Case resulted in a lower implied value for the

---

[2]    "Discounted cash flow (DCF) forms the core of finance…. Though professionals may employ other methods of valuation, such as relative valuation and the contingent claims approach, DCF forms the basis for all other valuations. Underscoring the importance of DCF valuation is the fact that it provides a linchpin to link various fields of finance." "Developing an Automated discounted Cash Flow Model." *The Valuation Handbook: Valuation Techniques from Today's Top Practitioners*. Ed. Rawley Thomas and Benton E. Gup. Hoboken: John Wiley & Sons, 2010. 110.
[3]    "While discounted cash flow valuation is only one of the three ways of approaching valuation and most valuations done in the real world are relative valuations, it is the foundation on which all other valuation approaches are built. To do relative valuation correctly, we need to understand the fundamentals of discounted cash flow valuation. This is why so much of this book focuses on discount cash flow valuation." Damodaran, Aswath. "Approaches to Valuation." *Investment Valuation*. 2nd ed. 11.
[4]    "In finance theory, present value models [also referred to as discounted cash flow models] are considered the fundamental approach to equity valuation." CFA® Program Curriculum 2015 • Level II • "Volume 4: Equity." CFA Institute, 2014.
[5] Steven M. Davidoff, Fairness Opinions, 55 AM. U. L. REV. 1557, 1573-78 (2006).

Company, enabling Defendants to mislead shareholders into accepting an inadequate Merger Consideration for their shares.

**III.    The Unreasonably Low Fairness Opinion Projections Were the Result of a Flawed and Conflicted Sales Process Fueled by the Individual Defendants' Self-Interests**

52.     Two main motivations guided the Individual Defendants' false and misleading actions: (1) in response to the failed Momentive Transaction in February of 2022, Jana Partners LLC ("Jana"), a significant shareholder of Zendesk at the time, threatened Zendesk with a proxy contest to replace the Board; and (2) realizing there would be an inevitable sale of Zendesk, the Individual Defendants wanted to ensure the beneficial treatment of their own equity awards.

### A.    Jana Threatens Zendesk with a Proxy Contest

53.     On October 28, 2021, Zendesk announced its proposed acquisition of Momentive, which was widely and publicly condemned by shareholders.

54.     Following the announcement of the Momentive Transaction and the ensuing decline in market capitalization, Jana publicly lambasted the Company's management and Board, noting in part:

> Zendesk is highly undervalued and has far more attractive opportunities to create shareholder value . . . the proposed Momentive acquisition lacks financial merit, has questionable strategic logic, and introduces a high degree of execution risk for Zendesk shareholders. . . . The proposed acquisition of Momentive . . . has led to a more than 20% decline in the Company's stock price in just a few weeks . . . [which] has erased approximately $3 billion of value from Zendesk's market capitalization, or roughly the entire purchase price being paid to acquire Momentive…
>
> The decline in the Company's value is all the more staggering considering Zendesk announced the acquisition along with reporting strong quarterly results that led every sell side analyst to increase their standalone growth assumptions for the Company and should have otherwise led to a significant increase in its stock price. . . .
>
> The glaring red flags surrounding the proposed acquisition of Momentive leave us questioning whether the transaction is motivated by other more problematic factors. Is this an attempt to ward off acquisition interest in Zendesk given its discounted valuation and history of spurning prior interest? Was this motivated by the Zendesk CEO's friendship with the CEO of Momentive? Or is the [B]oard simply not sufficiently engaged to appropriately safeguard shareholder interests?

Jana concluded its letter by noting that it "prefer[ed] to work collaboratively" but was "putting the [B]oard on notice . . . that [Jana] would not hesitate to seek to replace [B]oard members that

disenfranchise shareholders in order to consummate" the Momentive Transaction.

55.    The Momentive Transaction was likewise opposed by certain Momentive shareholders, who expressed concerns regarding the process that culminated in the deal, leading one market commenter to speculate that the Momentive Transaction was "so bad that it could possibly be one of the few, if any, mergers in history to be voted down by both sides," and which could lead to further trouble for the Board at the hands of Jana:

> Just terminating [the Momentive Transaction] alone should create tremendous value for shareholders. Once that happens, the second thing [Jana] could do to create shareholder value like they have done in many other companies is bringing an experienced and fresh perspective to the [B]oard. . . . As [Jana] does with most of their active engagements, and as they allude to in their letter, they are working with a team of public company directors and executives with relevant industry experience who would likely be excellent board candidates.

> The company's CEO, Mikkel Svane, is also its founder, and he is clearly brilliant but he might not be the best person to run the day-to-day operations of a public company. Moreover, the lead director, Carl Bass, is not a fan of activists: When engaged by activists as CEO of Autodesk he called them sports fans who think they know more than the coaches and owners. Less than one year later, he was no longer CEO of Autodesk. If he is not careful, he can experience a similar outcome here as he is up for re-election in 2022.

> The best thing the [B]oard can do for itself is promptly decide to terminate the merger agreement as a response to the will of the shareholders. If instead the agreement is terminated because shareholders vote against it, as it appears it will be, history has shown that this is a big endorsement for the activist and against management and will allow the activist to walk on to the [B]oard next annual meeting if they choose to do so. Further, at last year's annual meeting there were already signs of shareholder discontent – Hilarie Koplow-McAdams and Michelle Wilson, two of the three directors voted on, received 40.04% and 37.43% of votes against them.

> This situation would lead to the third value creation opportunity here—a sale of the [Company] to a strategic. Back in 2016, when Salesforce board member Colin Powell's email was hacked it was disclosed that Zendesk was on Salesforce's M&A target list but that their view was that the Zendesk CEO was not interested in selling. Likewise, private equity has shown interest with nothing to show for it. Well, an activist involved generally puts a company in pseudo-play, and a board that is on the precipice of losing a proxy fight suddenly gets incentivized to sell the company if they think they are going to be out one way or the other.[6]

---

[6] *See* Kenneth Squire, *Jana Partners may have a three-pronged plan to build value at Zendesk*, CNBC Delivering Alpha, Dec. 4, 2021, available at: https://www.cnbc.com/2021/12/04/jana-partners-may-have-a-threepronged-plan-to-build-value-at-zendesk.html.

56. Despite this public opposition, the Company did not terminate the Momentive Transaction and determined to have shareholders vote on it at a special meeting on February 25, 2022.

57. Meanwhile, as predicted, with Jana's threat of a proxy contest looming, the Consortium saw blood in the water and, on February 7, 2022, sent the Board an unsolicited acquisition proposal at a price range of $127-$132 per share in cash.

58. Two days later, the Board met with Goldman Sachs (who at the time was Zendesk's financial advisor in connection with the Momentive Transaction) to discuss the Consortium's proposal. The Board decided that the Consortium's proposal—**representing nearly double the Merger Consideration**—"**significantly undervalued Zendesk** and that it was not in the best interests of Zendesk and its stockholders to alter Zendesk's existing strategic plan and pursue the proposed transaction with the Consortium."

59. On February 10, 2022, the Company publicly announced its rejection of the Consortium's proposal.

60. Clearly frustrated, on February 16, 2022, Jana sent *another* scathing letter to the Board, in which it **publicly announced its intention to nominate four directors for election to the Board at the 2022 annual stockholder meeting**.

> Zendesk's . . . lengthy effort to win support for the Momentive acquisition has been met by vociferous and sustained rebuke. Jana [], other shareholders and sell-side analysts have criticized and opposed the acquisition. Last Friday we were joined by leading independent proxy advisory firms ISS and Glass Lewis, both of which advised Zendesk shareholders to vote AGAINST the transaction. With the February 25th vote fast approaching, we believe Zendesk shareholders will finally be able to save themselves from their own [B]oard by voting down the Momentive transaction.
>
> However, lasting damage has been done. We believe the [B]oard has all but assured that Zendesk will suffer a persistent discount to its intrinsic value. The [B]oard has shown a reckless disregard for shareholder capital, a seeming readiness to resort to *"questionable reasoning"*[] when challenged, and most recently reinforced concerns about its history of refusing to engage with interested strategic and financial buyers for the Company. With the current [B]oard at the helm, we believe shareholders are perpetually in danger of what Glass Lewis characterized as the [B]oard's *"ready, fire, aim"*[] process.
>
> To address the damage Zendesk's [B]oard has already inflicted on shareholders and

to protect against further harm, we believe the [B]oard must either be replaced with capable fiduciaries or reverse course and engage with interested strategic and financial buyers to sell the Company (emphasis in original).

61.     Thereafter, the Board and the Company's management met with certain Company shareholders, **including Jana**, to discuss, among other things, the Momentive Transaction, governance matters, and the Consortium's proposal.

62.     On February 25, 2022, prior to the shareholder vote on the Momentive Transaction, Jana released one more statement encouraging Zendesk shareholders to vote against the Momentive Transaction, and noting in part that "a rejection of the proposed Momentive acquisition would be a huge win for Zendesk shareholders, a repudiation of Zendesk's [B]oard, **and a strong indication that Zendesk either requires significant [B]oard change or should be sold**." Jana further chastised the Board for "burn[ing] tens of millions of dollars of shareholder capital pursuing Momentive, erod[ing] the [C]ompany's own credibility, and distract[ing] the [C]ompany from its attractive standalone prospects, while at the same time refusing to engage with buyers interested in acquiring Zendesk at a premium."

63.     Later that day, Zendesk shareholders voted overwhelmingly against the Momentive Transaction, and the transaction was thereafter terminated.

64.     Three days later, on February 28th, Jana sent *another* letter to the Board, noting in part:

> At Friday's extraordinary shareholder meeting, Zendesk's [B]oard received the lowest level of support of any disclosed deal-related shareholder vote (buyer or seller) in the Russell 3000 in the last 20 years (and possibly ever), garnering only 9% support (which would have been even lower excluding the roughly 3% held by management and other insiders). . . . We believe it could not be any clearer that Zendesk's [B]oard is disengaged and totally out of touch with shareholder priorities, lacks the requisite skillset to govern the [C]ompany on their behest and/or simply does not care enough to consider them. . . . We believe Zendesk requires either significant [B]oard change, or in the absence of such change, should be sold.[7]

---

[7] Notably, Jana's letter also referenced a profanity-laced December 4, 2021, email from lead independent director Defendant Bass in response to CNBC contributor Kenneth Squire following Mr. Squire's opinion piece of the same date, *see supra* note 6. Jana noted that the email "appear[ed] to be part of a pattern of hostility towards other points of view."

65.     With a proxy contest underway, on March 7, 2022, the Board met with Qatalyst Partners—which was engaged to help the Board resolve the proxy contest with Jana—to discuss "a range of potential strategic alternatives." Following discussion, and plainly in response to Jana's pending proxy contest, the Board "determined to explore more intensively a potential process to review strategic alternatives for Zendesk" and authorized Qatalyst Partners to contact potential counterparties, including the Consortium, in connection with their interest in a transaction.

66.     Importantly, on March 30, 2022, and again plainly in contemplation of a sales process, management discussed with the Board a proposed long-range plan through calendar year 2025 for Zendesk that would be provided to potential bidders in the strategic review process (*i.e.*, the Original March 2022 Case).

67.     Over the next several weeks, Zendesk management met with potential counterparties and supported due diligence efforts. Meanwhile, on April 7, 2022, Defendants Bass and Koplow-McAdams, and representatives of management, met with Jana to discuss the proxy contest. Jana *again reiterated* its binary options for the Board: **a change in Board composition or a sale of Zendesk.**

68.     On May 4, 2022, Qatalyst Partners provided to each of the remaining potential bidders in the strategic review process an updated long-range plan for Zendesk through calendar year 2025 (*i.e.*, the March 2022 Case) that was prepared by Zendesk management primarily reflecting certain changes to the Original March 2022 Case.

69.     On May 5, 2022, the Consortium submitted an updated indication of interest to acquire the Company for $120 in cash per share, and Bidder 2 indicated an acquisition price range of $125 to $135 per share. The Board met the following day to discuss the bids and the key assumptions underlying the indicative valuations. Thereafter, between May 7, and May 8, 2022, Qatalyst Partners had multiple discussions with the Consortium and "provided guidance to the Consortium that they **would need to improve their proposed price of $120.00 per share**."

70.     However, by the end of May, both the Consortium and Bidder 2 had significantly decreased their valuations of Zendesk. On May 24, 2022, the Consortium notified Qatalyst

Partners that their financing had been withdrawn and that they were lowering their valuation to $96.00 per share. On May 26, 2022, Bidder 2 likewise lowered its proposal to "as high as $110 per share."

71.     On May 27, 2022, Qatalyst Partners updated the Board, and the Board agreed to continue discussions on Bidder 2's proposal and a potential response thereto at a meeting the next day.

72.     However, also that same day, and *without any apparent instruction from the Board*, "Qatalyst Partners communicated to representatives of the Consortium that the Board [] would consider any actionable proposal, but until such time (i) would cease to engage with the Consortium because it had failed to deliver an actionable proposal and (ii) was focused on actionable proposals from other potential counterparties." On May 28, 2022, the Board instructed Qatalyst Partners to engage with Bidder 2 in an effort to improve its proposal to $115 per share. Subsequently, Bidder 2 informed the Company that it had again reduced its acquisition price range $90-$100 per share, and might reduce it again.

73.     Unsatisfied with the proposals put forth by the Consortium and Bidder 2—**each of which were still significantly higher than the Merger Consideration**—on June 6, 2022, the Board concluded that it was in the shareholders' best interests to continue executing Zendesk's plan as a stand-alone public company.

74.     That same day, the Board authorized Wachtell, Lipton, Rosen & Katz ("Wachtell Lipton"), the Company's legal counsel, to engage with counsel for Jana to discuss the potential for execution of a limited-duration nondisclosure agreement ("NDA"), in order for the Company to disclose to Jana that: (i) it intended to continue as a stand-alone company and publicly announce the end of the strategic review process, (ii) it would be scheduling its annual meeting, and (iii) it would like to discuss a potential settlement proposal concerning Jana's proxy contest.

75.     Jana rejected the offer to sign an NDA. Instead, on June 8, 2022, Jana issued a press release announcing its intention to sue Zendesk to compel it to schedule the 2022 annual shareholder meeting. Jana's press release provided, in part:

> Jana also commented on today's CNBC report that a sale process conducted by the Company's Board . . . is unlikely to result in a transaction.

Barry Rosenstein, Managing Partner of JANA, said, "Zendesk's Board has inflicted significant damage on its shareholders and its incumbent directors must stop hiding from accountability. To protect against further value destruction, shareholders must be given the opportunity to vote on directors who will act in their best interests and restore desperately needed value and credibility.

"It is inexcusable that the Board has yet to set a date for its 2022 annual meeting. Given Zendesk's 2021 annual meeting was held on May 18, 2021, we intend to take legal action to compel the Company to hold its 2022 annual meeting as promptly as possible if a meeting date is not set before the June 18 deadline. The Board must stop holding Zendesk hostage from its owners."

In response to today's CNBC report, Mr. Rosenstein added, "If CNBC's reporting is accurate, Zendesk shareholders should be furious. This report of a bungled sale process—following the Board's rejection of real interest in the Company in February to instead pursue the ill-conceived acquisition of Momentive, which was subsequently shunned by more than 90% of Zendesk's shareholders—would be the latest catastrophic example of the Board's inability to properly oversee management and the Company. Zendesk's stock price today hit a new 52-week low, illustrating that shareholders have lost confidence in the Company and further underscoring how desperately change is needed."

On February 16, 2022, Jana Partners put forward four highly qualified, independent directors who are committed to improving governance and accountability at Zendesk while working to rehabilitate the Company's damaged relationship with investors. Absent the significant boardroom change Jana has proposed to restore Zendesk's credibility, Jana believes the Company must be sold.

76.     The following day, the Company issued the press release announcing that **it had completed the strategic review process, had not received any actionable proposals, and had therefore determined that remaining an independent company was in the best interest of shareholders.** The press release also announced that the Company's annual meeting was set for August 17, 2022.

77.     With the clock ticking, the Board immediately turned its attention to Jana's proxy contest. On June 11, 2022, the Board authorized the commencement of settlement discussions with Jana, **which reportedly included the removals of CEO Mikkel Svane and Mr. Bass.**

78.     Again, sensing blood in the water, on June 14, 2022, the Consortium indicated to Qatalyst Partners that it could submit an acquisition proposal as high as $82 per share, if Zendesk's actual results for May 2022 were in line with expectations and subject to satisfactory responses to certain other confirmatory due diligence items. Following this outreach from the Consortium, Qatalyst Partners tried to re-engage Bidder 2 regarding an acquisition proposal.

Similar to the Consortium, Bidder 2 indicated that it would need to evaluate the Company's actual results for gross and net bookings for May 2022, and receive an update on the Company's business momentum. On June 17, 2022, the Consortium submitted an offer to acquire the Company for *only* $75.50 per share (the "June 17 Proposal").[8]

79.     Following the Consortium's June 17 Proposal, Zendesk proposed a limited confidentiality agreement with Jana **to disclose to Jana the June 17 Proposal in the context of settlement discussions**. On June 18, 2022, Jana agreed to enter into a confidentiality agreement. The following morning, Defendant Bass and counsel met with Jana to discuss the Consortium's proposal. Unsurprisingly, Jana expressed support for Zendesk engaging with the Consortium.

80.     Following the June 17 Proposal, and with a guarantee of Jana's support now in hand, Company management "commenced to update Zendesk's long-range plan" —*i.e.* lower the March 2022 Case—as the Board determined to proceed with negotiating a definitive transaction with the Consortium at a price they knew would undervalue the Company.

81.     On June 21, 2022, the Consortium submitted its "best and final" offer to acquire Zendesk for $77.50 per share. Jana, who was getting the sale it had publicly called for, stated that it would not oppose the Merger and that it would expect to terminate its proxy contest upon announcement of the Merger.

82.     **The day after** the Consortium submitted its low ball "best and final" offer, Zendesk management presented to the Board the June 2022 Case, which represented a significant reduction from the March 2022 Case. The Board immediately approved the June 2022 Case for use by Qatalyst Partners and Goldman Sachs in rendering their respective fairness opinions in connection with the Merger.[9]

---

[8] As part of the June 17 Proposal, the Consortium informed Zendesk that Significant LP Co-Investor B and Significant LP Co-Investor C would be increasing their commitments and investing alongside the Consortium. It is unclear whether Qatalyst Partners—whom the Consortium repeatedly asked to assist in securing financing—had a hand in these investors' increased commitments.

[9] Notably, in the two-year period ended June 24, 2022, Goldman Sachs has recognized compensation for financial advisory and/or underwriting services provided by its Investment Banking Division to the Consortium and/or its affiliates, in the aggregate of, **$268 million**.

19

83.    On June 24, 2022, and based on the significantly reduced Fairness Opinion Projections, the Board approved the Merger Agreement. On the same day, Jana withdrew its proxy contest.[10]

84.    Also notably, on July 6, 2022, Defendant Wilson resigned from the Board, effective immediately, and Defendants Bass and Szkutak announced that they would not stand for reelection to the Board at the Company's annual meeting.

85.    The Merger Consideration represents an almost 50% reduction from the offers submitted by the Consortium and Bidder 2 only two months prior in April 2022, *which the Board had rejected as insufficient*. Indeed, in October 2021, in connection with its fairness opinion for the Momentive Transaction, Goldman Sachs had valued Zendesk at $176 per share, which is $98.50 higher than the Merger Consideration. Even worse, following the announcement of the Merger Agreement, which artificially capped the Company's share price, on July 29, 2022, the Company reported strong Q2 2022 results, with revenue growing 28% year-over-year and free cash flow margin expanding to 10%. Surely the Company's management was aware of these improving financial results while it was simultaneously slashing the Company's projections in anticipation of a fairness opinion.

86.    In short, following a very public rebuke of the Momentive Transaction and in the face of an impending proxy contest, the Board succumbed to a Jana-forced sale of the Company and then drastically reduced the Company's projections, in order to secure a fairness opinion and justify the sale of Zendesk at an unfairly low Merger Consideration that the Board and management knew did not represent the true value of Zendesk.

---

[10] Notably, the Company has not disclosed whether Jana is receiving any additional benefits (economic or otherwise) from the Company and/or the Consortium in connection with the settlement and withdrawal of its proxy contest, a material omission considering its role in the Board's process. *See In re Am. Capital S'holder Litig.,* No. 422598-V, 2017 Md. Cir. Ct. LEXIS 4 (Jul. 12, 2017) ("There is also the issue that American Capital paid Elliot [(an activist investor)] $3 million for its role in the merger process . . . . Other than pressure to sell the company, it is not clear what Elliott brought to the table for the common stockholders. Why should the common stockholders of American Capital pay the legal fees of another stockholder, Elliott, for 'advising' the Company's board in a merger transaction if that transaction, independently considered (and vetted by two investment banks), is the product of rational business judgment?").

**B.      *Zendesk Management Took Steps to Ensure the Beneficial Treatment of Their Own Equity Awards***

87.      After realizing a sale of the Company was inevitable, Zendesk management took steps to ensure the beneficial treatment of their equity awards.

88.      On April 27, 2022, the Board approved and adopted Amendment No. 1 to the Zendesk, Inc. 2014 Stock Option and Incentive Plan (the "Plan Amendment") to:

> ensure that equity awards will be treated in accordance with the intent and purposes of the Company's existing Acceleration Plan and similar preexisting change in control provisions, including, in connection with an event constituting a change of control as defined under the Acceleration Plan that eligible employees under the Acceleration Plan have the ability to receive the benefits of outstanding awards that are assumed or substituted in any such event and, if certain outstanding awards are not assumed or substituted in such event, certain payments to eligible employees will be made in respect of the cancellation of such awards under the Plan's change in control provisions.

89.      Zendesk's Form 10-K/A, filed on May 2, 2022, discussing the Plan Amendment specifically noted that:

> Mr. Svane's equity awards have previously been subject to double-trigger change in control acceleration provisions pursuant to his grant agreements, which in certain cases pre-date the adoption of the Acceleration Plan and the Plan Amendment. The terms of Mr. Svane's acceleration provisions are consistent with the Acceleration Plan and the Plan Amendment. The Plan Amendment provides that all employees with a title of Vice President and above, including Mr. Svane, will be covered by the terms of the Company's Acceleration Plan.

90.      Additionally, the Proxy makes clear that, following the Consortium's "best and final" offer on June 21, 2022, representatives of Wachtell Lipton and the Consortium's legal counsel, Fried Frank, Harris, Shriver & Jacobson LLP, continued to exchange drafts of the Merger Agreement and the ancillary agreements, and those representatives continued to discuss the open issues in the agreements, including issues relating to the "treatment of equity awards and other employee matters."

91.      Moreover, on June 23, 2022, Wachtell Lipton provided a summary of a proposed retention equity award and severance program and, that same day, the Board approved an equity-based retention program pursuant to which certain executives were granted RSU Awards or Retention Grants.

92.     Similarly, in connection with the Merger, the Compensation Committee was permitted to award up to $30 million in *discretionary* bonuses to employees, including an aggregate of up to $7.5 million to certain executive officers.

93.     In other words, the Board and management knew that a sale was inevitable and began taking steps to "ensure" the beneficial treatment of their own equity awards. Indeed, in approving the Merger at the inadequate Merger Consideration, the Board succumbed to Jana's threats of a proxy contest in order to protect themselves from being publicly ousted, and CEO Svane was specifically protecting himself from being forced to resign as CEO without obtaining his Golden Parachute.

94.     In an effort to receive the above beneficial treatment and avoid further complications with Jana, the Board took advantage of the opportunity to sell the Company. To ensure the sale, the Board and management were forced to excessively reduce the Company's projections (even though they knew it was unwarranted) to secure a fairness opinion and justify the sale of Zendesk at an unfairly low Merger Consideration.

**IV.     The False and Misleading Statements in the Proxy**

95.     Defendants solicited shareholder approval for the Merger by filing a false and misleading Proxy with the SEC. This Proxy misled shareholders about Zendesk's value by making false and misleading statements concerning the Fairness Opinion Projections and the value of Zendesk shares. Specifically, Plaintiffs challenge the following statements from the Proxy as false and/or misleading:

   i)     "Qatalyst Partners was advised by Zendesk management, and Qatalyst Partners assumed based on discussions with Zendesk management and the Board of Directors, that the June 2022 Case had been reasonably prepared on bases reflecting the best currently available estimates and judgements of Zendesk management of the future financial performance of Zendesk and other matters covered thereby." Proxy at 47.

   ii)     "Goldman Sachs assumed with the consent of the Board of Directors

that the Forecasts were reasonably prepared on a basis reflecting the best then available estimates and judgements of Zendesk management." Proxy at 53.

iii)   The implied values per share of Zendesk that Qatalyst Partners and Goldman Sachs calculated in support of their respective "fairness" opinions, using the downwardly manipulated Fairness Opinion Projections. Proxy at 46-61.

96.   First, the Proxy falsely stated that the Board believed that the assumptions Zendesk management used as a basis for creating the downwardly-adjusted Fairness Opinion Projections—provided to Qatalyst Partners and Goldman Sachs for use in rendering their fairness opinions—were reasonable at the time.

97.   In March of 2022, the Company's management prepared the Original March 2022 Case, which they then updated in May of 2022 to create the March 2022 Case disclosed in the Proxy. Then, on June 22, 2022, management presented the downwardly revised June 2022 Case that was approved by the Board for use by the Company's financial advisors in rendering their fairness opinions. However, the Proxy failed to disclose adequate information explaining the significant reductions that were made over the course of management's preparations of these projections—all of which took place over only four months. It is highly unlikely that projections would change that drastically in only four months. Furthermore, if there were valid reasons for this change, Defendants would likely have included this information in the Proxy.

98.   Thus, as set forth above, the Board only downwardly-revised the Fairness Opinion Projections to justify an inadequate Merger Consideration from the Consortium, *following* a very public rebuke of the Momentive Transaction and in the face of an impending proxy contest from Jana, where the Individual Defendants were facing public ouster, and where Defendant Svane was facing the possibility of his forced resignation as CEO without obtaining his Golden Parachute.

99.   Defendant Svane and Company management created the Fairness Opinion Projections based on artificial assumptions that were inconsistent with their own publicly

expressed optimism regarding Zendesk's future. The Board was aware (i) that the Fairness Opinion Projections were created at their request; (ii) of the content of management's optimistic public statements; (iii) that that the downward revised Fairness Opinion Projections contradicted these optimistic statements; and (iv) that that the downward revised Fairness Opinion Projections needed to be created to justify a fairness opinion. The downward revisions were thus intended to reduce the Company's appraised value – not create projections that were more reflective of the Company's financial reality. In short, the Board did not believe that the Fairness Opinion Projections were based on management's best estimates of the Company's future performance.

100. <u>Second</u>, the values per share of Zendesk common stock resulting from Qatalyst Partners' and Goldman Sachs' analyses were false and misleading, because the valuations were based upon the inaccurate, downwardly-revised Fairness Opinion Projections that were only created to bring down the Company's value. As explained above, Qatalyst Partners' and Goldman Sachs' respective discounted cash flow analyses of Zendesk are the most material analysis that a banker can perform in valuing a company. These valuations, although swaddled with boilerplate disclaimers and provisos, fundamentally asserted that Qatalyst Partners valued Zendesk stock at $58.27 to $96.42 per share and that Goldman Sachs valued Zendesk stock at $66 to $166 per share (rounded to the nearest dollar). However, these valuations were false and misleading because their most crucial input—the Fairness Opinion Projections—casted a much more pessimistic outlook on the Company's value than actual reality. Accordingly, the resulting equity reference ranges induced shareholders to sell their stock at less than fair value.

## V. Zendesk Shareholders Suffered Financial Harm as a result of the False and Misleading Proxy

101. The Proxy caused Zendesk's stockholders harm by inducing them to accept a Merger Consideration that undervalued the Company, and therefore failed to compensate stockholders for the inherent value of their shares. Moreover, since the Merger could not have occurred without the approval of Company shareholders, the Proxy was an essential link in the accomplishment of the sale, and the misleading statements were the cause of the Class' economic loss.

102.    First, the Merger Consideration was **63% to 70% _below_** the original offer of $127 to $132 per share made by the Consortium in February 2022.

103.    In rejecting the Consortium's February 2022 offer, the Board stated that the offer—**that was nearly double the Merger Consideration**—"**significantly undervalued Zendesk** and that it was not in the best interests of Zendesk and its stockholders to alter Zendesk's existing strategic plan".

104.    Yet, the Consortium's February 2022 offer was in line with Goldman Sachs' fairness opinion in relation to the Momentive Transaction from only a month prior, whereby Goldman Sachs valued Zendesk at **between $130.00 to $197.00 per share** based on a discounted cash flow analysis.

105.    Second, on July 28, 2022, only about one month after management prepared the pessimistic June 2022 Case, Zendesk announced that Q2 2022 revenue had increased 28% year-over-year to $407.2 million, and Q2 2022 non-GAAP operating income was $23.6 million. Both of these numbers were at the high end of the Company's guidance provided on the Q1 2022 Earnings Call held on April 28, 2022.

106.    Moreover, in Q2 2022, non-GAAP gross margin improved one percentage point (from 81% to 82%) from the year prior, and free cash flow margin improved to 10% during the quarter from 7% from the year prior.

107.    To summarize, just one month after Zendesk management drastically lowered the projected growth of the Company in the June 2022 Case, that same management reported strong growth in Zendesk's public filings.

108.    Additionally, financial commentators reported that Zendesk's stock had the potential to rise in value if the Company continued to grow revenue above 20% for several more years with operating and free cash flow margins continuing to expand.

109.    Therefore, if Company shareholders had been informed of Zendesk's true value at the time of the Merger, the Board would have been unable to obtain a fairness opinion from Qatalyst Partners and Goldman Sachs, and Zendesk's shareholders would not have voted to approve the Merger at the Merger Consideration of $77.50. Furthermore, the Individual

Defendants' conduct caused Company shareholders to lose out on alternative options that offered greater value, including independently growing the Company or seeking better offers from alternative bidders that would have allowed shareholders (and not just Company management) to profit.

110.    For example, Light Street Management ("Light Street"), which owned more than 2% of Zendesk, proposed a recapitalization of the business, consisting of a $2 billion preferred equity investment arranged by Light Street and a $2 billion incremental debt facility. Together with $1 billion of cash from the balance sheet, Light Street proposed Zendesk conduct a $5 billion tender offer at $82.50 per share, resulting in a 6% increase from the Merger Consideration.

111.    Accordingly, Zendesk shareholders suffered damages in the amount of the difference between the Merger Consideration and the fair value of their shares as calculated in accordance with recognized methods of valuation.

## <u>COUNT I</u>
**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)**

112.    Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

113.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

114.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any

material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

115.   The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

116.   Defendants issued the Proxy to solicit Zendesk shareholders' support for the Merger. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which misrepresented and omitted the above-referenced material information, which in turn rendered the above-referenced sections of the Proxy materially false, misleading, and incomplete. The Proxy contained untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.

117.   Each of the Individual Defendants, by virtue of their roles as officers and/or directors of Zendesk were aware of the Zendesk valuation information but failed to ensure such information was disclosed in the Proxy in a non-misleading fashion, in violation of Section 14(a) and Rule 14a-9. The Individual Defendants knew that the Proxy was materially false, misleading, and incomplete in regard to the above-referenced material information. The Individual Defendants reviewed and relied upon the material information identified above in connection with their decision to approve and recommend the Merger; indeed, the Proxy states that Qatalyst Partners and Goldman Sachs reviewed and discussed their financial analyses with the Board, and further states that the Board considered the financial analyses provided by Qatalyst Partners and Goldman Sachs as well as their fairness opinions and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the true facts concerning the process resulting in the Merger, and Zendesk's true value that exceeded the Merger Consideration.

118.   The Individual Defendants knew that the material information identified above had been misrepresented and/or omitted in the Proxy, rendering the sections of the Proxy identified above to be materially false, misleading, and/or incomplete. Indeed, the Individual Defendants were required to review Qatalyst Partners' and Goldman Sachs' valuation analyses, question Qatalyst Partners and Goldman Sachs as to their derivation of fairness, and be particularly

attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there were no material misstatements or omissions. After reviewing both the underlying materials and the Proxy, the Individual Defendants failed to provide a non-misleading proxy solicitation.

119.    Each of the Individual Defendants was responsible for ensuring that the Proxy was not misleading, but failed to do so.

120.    Zendesk is also liable for violation of Section 14(a) of the Exchange Act as the issuing entity of the Proxy and by virtue of the Individual Defendants' violations of the Exchange Act.

121.    The above-referenced information was material to Plaintiffs and the Class, who were deprived of their right to cast an informed vote because such misrepresentations and omissions were not corrected prior to the Shareholder Vote.

122.    As a direct and proximate result of the dissemination of the materially false, misleading, and incomplete Proxy, Plaintiffs and the Class suffered damages and actual economic losses in an amount to be determined at trial. By reason of the misconduct detailed herein, Defendants are liable pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9.

## <u>COUNT II</u>

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

123.    Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

124.    The Individual Defendants acted as controlling persons of Zendesk within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Zendesk, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false, misleading, and incomplete statements contained in the Proxy filed with the SEC, the Individual Defendants had the power to influence and control—and did influence and control—directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are materially false, misleading, and incomplete.

125.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

126.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of the Board to approve the Merger. They were thus directly involved in preparing this document.

127.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and/or approving the Merger.  The Proxy described the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

128.    By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act.

129.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' conduct, Plaintiffs and the Class have suffered damages and actual economic losses in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class action and certifying Plaintiffs as Class Representatives and their counsel as Class Counsel;

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

1        B.      Awarding Plaintiffs and the Class damages sustained as a result of Defendants'

2  wrongdoing, including but not limited to compensatory damages, rescissory damages, and quasi-

3  appraisal damages, plus pre-judgment and post-judgment interest;

4        C.      Awarding Plaintiffs and the Class the costs and disbursements of this action,

5  including reasonable attorneys' and expert fees and expenses; and

6        D.      Granting such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

DATED: March 17, 2023

Respectfully submitted,

**OF COUNSEL**

*/s/ David E. Bower*
David E. Bower, SBN 119546

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
Rossella Scarpa
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
jmonteverde@monteverdelaw.com
rscarpa@monteverdelaw.com

**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (310) 446-6652
Fax: (212) 202-7880
dbower@monteverdelaw.com

*Counsel for Plaintiffs*

*Counsel for Plaintiff Brian Bailey*

**KAHN SWICK & FOTI, LLC**
Michael Palestina
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
Tel: (504) 455-1400
Direct: (504) 648-1843
Fax: (504) 455-1498
Email: michael.palestina@ksfcounsel.com

*Counsel for Plaintiff Scott Franklin*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934