# APPENDIX

## REDLINE COMPARING AMENDED COMPLAINT TO PRIOR PLEADING

Juan E. Monteverde (admitted *pro hac vice*, NY Reg. No. 4467882)
**MONTEVERDE & ASSOCIATES PC**
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, New York 10118
Tel: (212) 971-1341
jmonteverde@monteverdelaw.com

David E. Bower (SBN 119546)
**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (213) 446-6652
Fax: (212) 202-7880 dbower@monteverdelaw.com

*Counsel for Co-Lead Plaintiffs and*
*Co-Lead Counsel for the Putative Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| BRIAN BAILEY and SCOTT FRANKLIN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ZENDESK, INC., MIKKEL SVANE, ARCHANA AGRAWAL, CARL BASS, MICHAEL CURTIS, MICHAEL FRANDSEN, BRANDON GAYLE, STEVE JOHNSON, HILARIE KOPLOW–MCADAMS, and THOMAS SZKUTAK, and MICHELLE WILSON,<br><br>Defendants. | Civil Action No. 3:23-cv-1243<br><br>Civil Action No. 23-cv-01243-JSC<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>1. Violation of Exchange Act §14(a) & Rule 14a9 17CFR §244.100<br><br>2. Violation of Exchange Act §20(a)<br><br>**DEMAND FOR JURY TRIAL**<br><br>VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 |

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

Lead Plaintiffs Brian Bailey and Scott Franklin (the "("Plaintiffs"), by and through their undersigned attorneys, bring this stockholder class actionAmended Class Action Complaint on behalf of themselves and all other similarly situated former public stockholders of Zendesk, Inc. ("Zendesk" or the "Company") against Zendesk and the former members of the Company's board of directors (the "Board," or the "Individual Defendants," and together with Zendesk, the "Defendants"), for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9.

## NATURE OF THE ACTION

## INTRODUCTION

1.    Plaintiffs' claims arise in connection with the all-cash sale of Zendesk (the "Merger") to the affiliates of the funds advised by Hellman & Friedman LLC ("H&F") and Permira Advisers LLC ("Permira," and together with H&F, the "Consortium").

2.    On June 24, 2022, Zendesk, Zoro Bidco, Inc. ("Parent"), and Zoro Merger Sub, Inc. ("Merger Sub")[1], a direct wholly owned subsidiary of Parent, entered into the Agreement and Plan of Merger ("Merger Agreement"), wherebypursuant to which, on November 22, 2022, the Consortium would acquireacquired Zendesk at a price of for just $77.50 in cash per share of Zendesk common stock owned (the "Merger Consideration"). As discussed in depth below, the Merger Consideration significantly undervalued the Company.

3.    On August 8, 2022, Defendants solicited the Company's shareholders' approval of the unfair Merger by issuing a Definitive Proxy Statement (the "Proxy") with the U.S. Securities and Exchange Commission ("SEC") thatIn connection with the then-proposed Merger, on August 8, 2022, Defendants issued a materially false and misleading Definitive Proxy Statement (the "Proxy") with the U.S. Securities and Exchange Commission ("SEC") soliciting Zendesk's shareholders to approve the Merger. As outlined below, in the lead up to the execution of the Merger Agreement, the Company's Board and management drastically reduced the Company's

---

[1]    Parent and Merger Sub are the affiliates of the funds advised by the Consortium.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

financial projections to secure fairness opinions from the Board's financial advisors, Qatalyst Partners LP ("Qatalyst") and Goldman Sachs & Co. LLC ("Goldman Sachs," and together with Qatalyst, the "Financial Advisors"). The Proxy included several misleading statements and misrepresentations regarding this subterfuge, including regarding (i) the preparation of the Company's financial projections, (ii) the Financial Advisors' assumptions related thereto, and (iii) the Financial Advisors' valuation analyses utilizing these reduced financial projections.

4.     In reliance on the materially misleading Proxy, on September 19, 2022, Zendesk shareholders approved the Merger Agreement.

5.     On November 22, 2022, the Merger was consummated, and pursuant to the terms of the Merger Agreement, Merger Sub merged with and into Zendesk, with Zendesk surviving the Merger as a wholly owned subsidiary of Parent. The consummation of the Merger caused Zendesk's shares to be cashed out and delisted from the NYSE, thereby denying shareholders the ability to profit from the Company's future growth.

6.     For the foregoing reasons, and as set forth in further detail below, Plaintiffs seek to recover damages from Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act.

## SUMMARY OF THE ACTION

7.     Zendesk, founded in 2007, "is a service-first customer relationship management company, built to give organizations of all sizes, in every industry, the ability to deliver a transparent, responsive and empowering customer experience." By 2021, Zendesk had established itself as a "premier name in customer service software" and "'best of breed' software vendor."[2]

8.     In October 2021, Zendesk announced its proposed acquisition of Momentive Global Inc. (the "Momentive Transaction"). In connection with the Company's entry into and solicitation of support for the Momentive Transaction, "Zendesk management [] prepared certain unaudited prospective financial information of Zendesk on a standalone basis for fiscal years 2021 through 2025" (hereinafter the "Momentive Transaction Projections"), and Goldman Sachs

---

[2]     *See* Gary Alexander, *Zendesk: Time To Back Off*, SᴇᴇᴋɪɴɢAʟᴘʜᴀ (May 12, 2021), https://seekingalpha.com/article/4427722-zendesk-time-to-back-off.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

– who was also advising the Company in connection with the Momentive Transaction – **valued Zendesk from $130 to $197 per share (with a midpoint of $163.50)** in a discounted cash flow ("DCF") analysis using the Momentive Transaction Projections.

9.      The Momentive Transaction was widely and publicly condemned by shareholders, and, after its announcement, Zendesk's stock price plunged and the stock received multiple downgrades from market analysts. Following the announcement of the Momentive Transaction and ensuing decline in stock price and market capitalization, JANA Partners LLC ("JANA"), a significant shareholder of the Company, publicly lambasted the Company's management and Board, noting "glaring red flags surrounding the proposed [Momentive Transaction]" that left JANA "questioning whether the transaction [was] motivated by other more problematic factors," including an ineffective Board that was "not sufficiently engaged to appropriately safeguard shareholder interests[.]" JANA concluded its public tirade by noting that, while it "prefer[ed] to work collaboratively," it was "putting the [B]oard on notice . . . that [JANA] would not hesitate to **seek to replace [B]oard members**" that support the Momentive Transaction.

10.      Despite this public opposition, the Company did not terminate the Momentive Transaction.  Instead, the Board determined to have shareholders vote on the transaction at a special meeting on February 25, 2022.

11.      Clearly seeing value left on the table in the Momentive Transaction, and while the vote on the Momentive Transaction was still pending, on February 7, 2022, the Consortium sent the Board an unsolicited acquisition proposal for the potential acquisition of the Company at an indicative price range between $127.00 and $132.00 per share in cash – nearly double the Merger Consideration, and in line with Goldman Sachs' $130-$197 per share valuation range of Zendesk in connection with the Momentive Transaction. The Board determined that the Consortium's $127.00 and $132.00 per share offer **"significantly undervalued Zendesk and that it was not in the best interests of Zendesk and its stockholders to alter Zendesk's existing strategic plan and pursue the proposed transaction with the Consortium."** On February 10, 2022, the Company publicly announced its rejection of the Consortium's proposal.

12.      Days later, on February 16, 2022, JANA sent another scathing letter to the Board,

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

highlighting market opposition to the Momentive Transaction, criticizing the Board's "reckless disregard for shareholder capital" and its refusal to engage with interested buyers, and announced its intention to nominate four directors for election to the Board: "To address the damage Zendesk's [B]oard has already inflicted on shareholders and to protect against further harm, we believe the [B]oard must either be replaced with capable fiduciaries or reverse course and engage with interested strategic and financial buyers to sell the Company."

13.    Thereafter, during the period prior to the February 25, 2022 special meeting of Zendesk stockholders held in connection with the Momentive Transaction, the Board and the Company's management met with certain Company shareholders, including JANA, to discuss, among other things, the Momentive Transaction, governance matters, and the Consortium's proposal.

14.    On February 25, 2022, prior to the shareholder vote on the Momentive Transaction, JANA released another statement encouraging shareholders to vote against the transaction, noting in part that "a rejection of the proposed Momentive acquisition would be a huge win for Zendesk shareholders, a repudiation of Zendesk's [B]oard, and a strong indication that Zendesk either requires significant [B]oard change or should be sold." JANA further chastised the Board for "burn[ing] tens of millions of dollars of shareholder capital pursuing Momentive, erod[ing] the [C]ompany's own credibility, and distract[ing] the [C]ompany from its attractive standalone prospects, while at the same time refusing to engage with buyers interested in acquiring Zendesk at a premium."

15.    Later on February 25, 2022, Zendesk shareholders voted overwhelmingly against the Momentive Transaction, and the transaction was thereafter terminated.

16.    Three days later, on February 28, JANA sent another letter to the Board, in which it highlighted the Momentive Transaction's "lowest level of support of any disclosed deal-related shareholder vote," stated that "it could not be any clearer that Zendesk's [B]oard is disengaged and totally out of touch with shareholder priorities," and concluded that the Company "require[d] either significant [B]oard change, or in the absence of such change, should be sold."

17.    **In short, JANA was clear: the Board could either sell the Company, or it would**

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

**be removed. The Board chose the former, to shareholders' detriment.**

18.     In response to JANA's proxy contest, the Board quickly "determined to explore more intensively a potential process to review strategic alternatives for Zendesk" – a euphemism for a sales process – and authorized its financial advisor, Qatalyst, to contact potential counterparties, including the Consortium, in connection with their interest in a sale.

19.     In connection with the Board's newfound interest in selling the Company, **and despite having just prepared the Momentive Transaction Projections**, on March 30, 2022, management discussed with the Board a new proposed long-range plan through calendar year 2025 that Zendesk would provide to bidders in the sales process.

20.     Meanwhile, the Board made one last attempt to stave off JANA's proxy contest. On April 7, 2022, Defendants Bass and Koplow-McAdams and members of Zendesk management met with JANA "to discuss the then current proxy contest." JANA again reiterated its binary options for the Board: a change in Board composition, or a sale.

21.     Unwilling to face a public ousting, the Board and management prepared for a sale. First, they created projections to value the Company in a sale. Specifically, on April 18, 2022, when the Company sent a process letter to counterparties requesting preliminary indications of interest by May 5, 2022, it included "a long-range plan for Zendesk through calendar year 2025



that had been prepared by Zendesk's management" (hereinafter, and as updated on May 4, 2022, the "March 2022 Case"). Notably, the March 2022 Case – which, again, was updated and confirmed in May 2022 – projected **higher** revenues in each year of the projection period than the Momentive Transaction Projections:

In other words, as of May 2022, the Board projected that the Company would do better – not worse – than it was projected to do in the Momentive Transaction Projections, based on which Goldman Sachs valued the Company as high as $197 per share.

22.    Second, Defendants made sure that they and other insiders would be taken care of on the way out. Specifically, on April 27, 2022, the Board approved and adopted Amendment No. 1 to the Zendesk, Inc. 2014 Stock Option and Incentive Plan (the "Plan Amendment") "to ensure" that the equity awards of "all employees with a title of Vice President and above" would be subject to accelerated vesting in connection with a change of control.

23.    Negotiations with bidders continued and, on May 5, 2022, the Company received indications of interest from the Consortium (for **$120 per share**) and Bidder 2 (for a range of **$125 to $135 per share**). However, by the end of May, and aware that the Board was under extreme pressure from JANA to sell, both bidders significantly decreased their proposals, with the Consortium proposing just $96.00 per share and Bidder 2 proposing a range of $90-$100 per share.

24.    **Unsatisfied with these proposals – each of which were still significantly higher than the Merger Consideration – on June 6, 2022, the Board concluded that it was in shareholders' best interests to terminate the sales process and continue executing Zendesk's plan as a stand-alone public company.**

25.    But there was still JANA. With its tail between its legs, the Board reached out to JANA to discuss potentially executing a limited-duration non-disclosure agreement ("NDA"), in order for the Company to disclose to JANA that: (i) it intended to continue as a stand-alone company and publicly announce the end of the strategic review process, (ii) it would be scheduling its annual meeting, and (iii) it would like to discuss a potential settlement proposal concerning JANA's proxy contest. JANA swiftly rejected the Board's offer to sign an NDA and,

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

instead, issued another press release on June 8, 2022 in which it announced its intention to sue Zendesk to compel it to schedule its annual shareholder meeting to hold the Board accountable and give shareholders the opportunity "[t]o protect against further value destruction" and "restore desperately needed value and credibility." JANA, again, reiterated the binary options facing the Board: "[a]bsent the significant boardroom change JANA has proposed to restore Zendesk's credibility, JANA believes the Company must be sold."

26.    The next day, on June 9, 2022, the Company publicly announced that it had completed its strategic review, **had not received any actionable proposals,** and had therefore **determined that remaining an independent company was in the best interest of shareholders**. In the same announcement, the Company disclosed that it had set its annual meeting for **August 17, 2022**. In other words, the Board's day of reckoning was *just* **two months away**.

27.    With the clock ticking, the Board immediately turned its attention to JANA's looming proxy contest. On June 11, 2022, the Board authorized the commencement of settlement discussions with JANA, **which reportedly included the removals of Defendant Svane (Chairman and CEO and a founder of Zendesk) and Bass**.

28.    Meanwhile, as a result of the Momentive Transaction debacle, JANA's ensuing public proxy contest, and the publicly announced unsuccessful sales process, the Company's stock price had declined to a closing price of just $59.96 per share on June 13, 2022. Sensing blood in the water, and aware of the Board's desperation, the Consortium contacted Qatalyst "to express renewed interest" in an acquisition. On June 17, 2022, the Consortium submitted an offer to acquire the Company for *only* $75.50 per share (the "June 17th Proposal"). Shortly thereafter, the Board entered into a limited confidentiality agreement with JANA to disclose the June 17th Proposal "in the context of settlement discussions," and, after securing JANA's support, determined to expeditiously proceed with negotiating a definitive transaction with the Consortium. Barely one week later, on June 21, 2022, the Consortium submitted its "best and final" offer to acquire Zendesk for $77.50 per share. JANA, who was getting the sale it had publicly called for, blessed the transaction and **indicated it would terminate its proxy contest**

**upon an announcement of the transaction**.

29.    The only problem was that the Board needed lower projections to justify the Consortium's proposal.  Conveniently, **the following day**, June 22, 2022 – barely **one month** after the Board updated and confirmed the March 22 Case – management presented to the Board an "updated" long-range plan for Zendesk (dubbed the "June 2022 Case" in the Proxy;

| (in millions) | | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Momentive Transaction Projections | Revenue | $1,695 | $2,144 | $2,702 | $3,377 | | | | | | |
| | Non-GAAP Operating Income | $ 127 | $ 182 | $ 284 | $ 422 | | | | | | |
| | Unlevered Free Cash Flow (incl. SBC) | $ (46) | $ (34) | $ (24) | $ 27 | | | | | | |
| March 2022 Case | Revenue | $1,715 | $2,172 | $2,743 | $3,423 | $4,255 | $5,255 | $6,453 | $7,872 | $9,549 | $11,507 |
| | Non-GAAP Operating Income | $ 137 | $ 185 | $ 288 | $ 428 | $ 596 | $ 814 | $1,097 | $1,417 | $1,814 | $ 2,301 |
| | Unlevered Free Cash Flow (incl. SBC) | $ (66) | $ (88) | $ (41) | $ 31 | $ 109 | $ 262 | $ 476 | $ 727 | $1,059 | $ 1,489 |
| June 2022 Case | Revenue | $1,674 | $1,961 | $2,363 | $2,881 | $3,483 | $4,176 | $4,965 | $5,854 | $6,844 | $ 7,932 |
| | Non-GAAP Operating Income | $ 138 | $ 167 | $ 248 | $ 360 | $ 488 | $ 647 | $ 844 | $1,054 | $1,300 | $ 1,586 |
| | Unlevered Free Cash Flow (incl. SBC) | $ (60) | $ (65) | $ (21) | $ 40 | $ 106 | $ 230 | $ 394 | $ 576 | $ 803 | $ 1,082 |

hereinafter, the "Fairness Opinion Projections"). As is apparent, the Fairness Opinion Projections

| March 2022 Case v. June 2022 Case | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenue % change from March 2022 Case | -2% | -10% | -14% | -16% | -18% | -21% | -23% | -26% | -28% | -31% |
| Non-GAAP Operating Income % change from March 2022 Case | 1% | -10% | -14% | -16% | -18% | -21% | -23% | -26% | -28% | -31% |
| Unlevered Free Cash Flow % change from March 2022 Case | 9% | 26% | 49% | 29% | -3% | -12% | -17% | -21% | -24% | -27% |

represented a **significant reduction** from the Momentive Transaction Projections and the March 2022 Case (which, again, had been updated and confirmed in May 2022):

1

2

3

4

5

6

7

8

9

10

11

12

13



30.    On June 23, 2022, the **day after** they **first** reviewed the Fairness Opinion Projections, the Board approved the Fairness Opinion Projections for use by Qatalyst and Goldman Sachs in rendering their respective fairness opinions.

31.    Using these reduced projections as the basis for their DCF analyses, Goldman Sachs

14

15

16

17

18

19

20

21

22

23

24

25

26



and Qatalyst thereafter calculated implied valuations for Zendesk of just $66 to $116 and $58.27 to $96.42 per share, respectively.

27

28

32.    These eleventh-hour downward revisions to the Company's financial projections and the valuations that they implied were contrary to every objective metric of the Company's value:

a.    The reductions were contrary to the Momentive Transaction Projections and the March 2022 Case, which the Board had updated and confirmed in May 2022, barely a month before the June reductions.

b.    As outlined below, the reductions were contrary to the Company's actual results and management's public comments regarding the Company's path forward and "extremely strong foundation for continued long term growth."

c.    The valuations implied by the reduced Fairness Opinion Projections were contrary to Goldman Sachs' own October 2021 valuation of the Company, at which time it valued Zendesk between $130 to $197 per share, **$52.50-$119.50 higher per share** than the Merger Consideration the Board accepted just nine months later.

d.    And the Merger Consideration that the Board accepted based on these reduced projections was contrary to the bids received during the process, which ranged from $120 to $135 per share and which the Board rejected in May 2022 as not actionable.

33.    On June 24, 2022 – **two days after they first reviewed the Fairness Opinion Projections** – and now armed with the Financial Advisors' fairness opinions, the Board approved the Merger Agreement. **On the same day, JANA withdrew its proxy contest.**

34.    Notably, just before doing so, on June 23, 2022, the Board juiced management's financial compensation in connection with the Merger by approving an equity-based retention program pursuant to which certain executives were granted RSU Awards or "Retention Grants," and a transaction incentive pool pursuant to which the Board's Compensation Committee was permitted to award up to $30 million in discretionary bonuses to employees, including an aggregate of up to $7.5 million to certain executives other than the CEO.

3.35.    Then, having secured the fairness opinions as a legal shield against claims and personal financial benefits for themselves, Defendants misled shareholders. Specifically, in order to convince shareholders to support the Merger, the Board disseminated the materially misleading

**AMENDED** CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

Proxy. The Proxy contained the following materially false and misleading statements:

i.a.    "Qatalyst Partners was advised by Zendesk management, and Qatalyst Partners assumed based on discussions with Zendesk management and the Board of Directors, that the June 2022 Case had been reasonably prepared on bases reflecting the best currently available estimates and judgements of Zendesk management of the future financial performance of Zendesk and other matters covered thereby." Proxy at 47.;

ii.b.    "Goldman Sachs assumed with the consent of the Board of Directors that the Forecasts were reasonably prepared on a basis reflecting the best then available estimates and judgements of Zendesk management." Proxy at 53.;

c.    The implied values per share of Zendesk that the Company's financial advisors in connection with the Merger, Qatalyst Partners LP ("Qatalyst Partners") and Goldman Sachs & Co. LLC ("Goldman Sachs")That "in the view of Zendesk management" the "Management Projections" -- which was defined to include the Fairness Opinion Projections – "were reasonably prepared in good faith on a basis reflecting the best available estimates and judgments at the time of preparation, and presented as of the time of preparation", "were prepared on a reasonable basis" and "are based upon a variety of estimates and assumptions" that were "considered reasonable by Zendesk management, as of the date of their preparation." Proxy at 64-65; and

iii.d.    The implied per share value for Zendesk that the Financial Advisors calculated in support of their respective "fairness" opinions, using the downwardly manipulated June 2022 Case (*i.e.,* the "Fairness Opinion Projections").). Proxy at 46-61.

4.    In March of 2022, the Company's management prepared a long-range plan for Zendesk through calendar year 2025 (the "Original March 2022 Case"), and then updated those projections in May of 2022 to create the March 2022 Case disclosed in the Proxy. On June 22, 2022, management presented to the Board the downwardly revised June 2022 Case, which the Board then approved for use by the Company's financial advisors in rendering their fairness opinions. Notably, the June 2022 Case was prepared only *two days prior* to approval of the Merger Agreement by the Board.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

5.    Indeed, in order to justify a Merger Consideration that they knew was inadequate, the Board (i) directed Company management to downwardly revise the March 2022 Case to create the unreasonably low Fairness Opinion Projections; and then (ii) ordered Qatalyst Partners and Goldman Sachs to utilize the unreasonably low Fairness Opinion Projections as the basis for their respective fairness opinions.  Thus, the three above material statements identified from the Proxy falsely represented the reasonableness of the Fairness Opinion Projections to the Company's shareholders, and misled Zendesk shareholders as to the fair value of their shares (discussed further herein).

6.    Moreover, in anticipation of the Merger, and *the day after* the Board approved the June 2022 Case, the Board ensured the beneficial treatment of their own equity awards by approving an equity-based retention program, pursuant to which certain executives were granted RSU Awards or Retention Grants.  Moreover, in connection with the Merger, the Compensation Committee of the Board approved an award of up to $30 million in *discretionary* bonuses to employees, including an aggregate of up to $7.5 million to certain executive officers.

7.    The special meeting of Zendesk shareholders to vote on the Merger was held on September 19, 2022 (the "Shareholder Vote"), and resulted in the Company's shareholders approving the Merger Agreement based upon the materially false and misleading Proxy.

36.    With JANA at bay, on August 17, 2022, Zendesk held its annual shareholder meeting, and the incumbent Board members up for reelection secured shareholder approval and avoided the professional embarrassment of a public ousting. The Board could see the proverbial light at the end of the tunnel (*i.e.* the Merger).

37.    But then, on August 28, 2022, Light Street Capital Management, LLC ("Light Street") – which managed funds that owned more than 2% of Zendesk – sent a letter to the Board declaring its intent to vote against the then-proposed Merger and proposing "an alternative and superior path forward for the Company's shareholders" that contemplated a recapitalization of Zendesk, the proceeds of which, together with cash on Zendesk's balance sheet, would be used

to finance a $5 billion tender offer for approximately 50% of Zendesk's outstanding common shares at **$82.50 per share** (the "Light Street Proposal"). The Light Street Proposal further contemplated expanding the size of the Board to ten seats and the appointment of five of its nominees to the expanded Board, and the formation of a special committee to identify and hire a successor CEO. On August 29, 2022, Light Street publicly announced the transmission of its letter and proposal, highlighted "that the Proposed [Merger] materially undervalue[d] Zendesk[,]" and "outline[d] recent examples of active obstruction of shareholder rights" by the Board.

38.    With a new threat looming, and with personal benefits riding on the Merger with the Consortium, the Board quickly determined, and announced on September 1, 2022, that the Light Street Proposal was "neither a 'Superior Proposal' nor reasonably likely to lead to a 'Superior Proposal' under the terms of [the Merger Agreement]." Over the next several days, the Board and management further campaigned against the Light Street Proposal and in favor of the Merger.

39.    Notably, in light of the fact that the Company's 2021 annual meeting of stockholders was held on May 18, 2021, and the Company's 2022 annual meeting of stockholders was held on August 17, 2022, it is likely that the Board purposefully delayed Zendesk's annual meeting of stockholders for months for the purpose of preventing stockholders from selecting a competing slate of board nominees. In addition, by approving the Merger Agreement on June 23, 2022, just four days following the deadline for submission of stockholder proposals, the Board ensured that investors had little recourse and insufficient time to submit director nominations or alternative business proposals as a part of Zendesk's 2022 annual meeting of stockholders. These actions manipulated the makeup of the Board, circumvented shareholder rights, and demonstrate a common theme – active obstruction of shareholder rights.

40.    Ultimately, the Board's obstructionist efforts succeeded, and, based on the materially misleading Proxy, on September 19, 2022, shareholders voted in favor of the Merger.

8.1.    **In sum, following a public rebuke of the Momentive Transaction and in the face of an impending proxy contest loss (and CEO Svane facing the possibility of a forced**

1   **resignation from the Company he co-founded without obtaining his Golden Parachute),**

2   **Defendants succumbed to a JANA-forced sale of the Company and then drastically reduced**

3   **the Company's projections in order to secure fairness opinions and justify the sale of**

4   **Zendesk for the unfairly low Merger Consideration.**~~On November 22, 2022, the Merger was~~

5   ~~consummated, and pursuant to the terms of the Merger Agreement, Merger Sub merged with and~~

6   ~~into Zendesk, with Zendesk surviving the Merger as a wholly owned subsidiary of Parent. The~~

7   ~~consummation of the Merger caused Zendesk's shares to be cashed out and delisted from the~~

8   ~~NYSE, thereby denying shareholders the ability to profit from the Company's future growth.~~

9   ~~9.~~41.   ~~For the foregoing reasons, and as set forth in further detail below, Plaintiffs seek to~~

10  ~~recover damages from Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act.~~

11                              **JURISDICTION AND VENUE**

12  ~~10.~~42.   This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange

13  Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as ~~the~~ Plaintiffs allege

14  violations of Section 14(a) and 20(a) of the Exchange Act.

15  ~~11.~~43.   Personal jurisdiction exists over each Defendant. This Court has jurisdiction over

16  Zendesk because the Company has its principal place of business in the State of California. This

17  Court has jurisdiction over the Individual Defendants because each conducted business in or

18  maintained operations in this State at the times material hereto. Additionally, each Individual

19  Defendant committed violations of the Exchange Act within this State, and each has sufficient

20  minimum contacts with this District as to render the exercise of jurisdiction over the Defendants

21  by this Court permissible under traditional notions of fair play and substantial justice. Moreover,

22  "[w]here a federal statute such as Section 27 of the [Exchange] Act confers nationwide service

23  of process, the question becomes whether the party has sufficient contacts with the United States,

24  not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).

25  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act

26  confers personal jurisdiction over the defendant in any federal district court." *Id*. at 1316.

27  ~~12.~~44.   Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C.

28  § 1391, because Defendants are found in or transact business in this District. Indeed, Zendesk's

1    principal executive offices ~~were~~are located in this District at 989 Market Street, San Francisco,

2    CA 94103.

3                                              **PARTIES**

4        ~~13.~~45.  Plaintiff Brian Bailey was~~,~~ at all relevant times~~,~~ a shareholder of Zendesk.

5        ~~14.~~46.  Plaintiff Scott Franklin was~~,~~ at all relevant times~~,~~ a shareholder of Zendesk.

6        ~~15.~~47.  Defendant Zendesk, Inc. was a Delaware corporation with principal executive

7    offices located at 989 Market Street, San Francisco, CA 94103. Prior to the consummation of the

8    Merger, Zendesk's common stock traded on the NYSE under the ticker symbol "ZEN."

9        ~~16.~~48.  Defendant Mikkel Svane ("Svane") was, at all relevant times, a director, Chairman

10   of the Board and the Chief Executive Officer of Zendesk. Svane is one of Zendesk's three

11   founders. Svane signed the Proxy in his capacity of Chairman of the Board and Chief Executive

12   Officer.

13       ~~17.~~49.  Defendant Archana Agrawal was, at all relevant times, a director of Zendesk.

14       ~~18.~~50.  Defendant Carl Bass was, at all relevant times, a director of Zendesk.

15       ~~19.~~51.  Defendant Michael Curtis was, at all relevant times, a director of Zendesk.

16       ~~20.~~52.  Defendant Michael Frandsen was, at all relevant times, a director of Zendesk.

17       ~~21.~~53.  Defendant Brandon Gayle was, at all relevant times, a director of Zendesk.

18       ~~22.~~54.  Defendant Steve Johnson was, at all relevant times, a director of Zendesk.

19       ~~23.~~55.  Defendant Hilarie Koplow-McAdams ("Koplow-McAdams") was, at all relevant

20   times, a director of Zendesk. Koplow-McAdams remains an "Independent Board Member" of the

21   now-private Company.

22       ~~24.~~56.  Defendant Thomas Szkutak was, at all relevant times, a director of Zendesk.

23       ~~25.~~    ~~Defendant Michelle Wilson was, at all relevant times, a director of Zendesk.~~

24       ~~26.~~57.  The Individual Defendants referred to in ¶¶ ~~16-25~~48-56 are collectively referred to

25   herein as the "Individual Defendants" and/or the "Board"~~",~~," and, together with Zendesk, the

26   "Defendants".

27                                    **RELEVANT NON-PARTIES**

28       58.    Michelle Wilson was a director of Zendesk from 2014 through July 6, 2022, on

                                                  16

1  which date she resigned from the Company's board of directors.

2       59.    Ronald Pasek was a director of Zendesk from July 6, 2022 through the closing of

3  the Merger.

4                          **CLASS ACTION ALLEGATIONS**

5       27.60.  Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23 on behalf of

6  themselves and the other former public stockholders of Zendesk who held shares of Zendesk

7  common stock as of the August 4, 2022 record date to vote on the Merger and were harmed by

8  Defendants' actions alleged herein (the "Class"). Excluded from the Class are Defendants herein

9  and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

10      28.61.  This action is properly maintainable as a class action because:

11          (a)a.    Thethe Class is so numerous that joinder of all members is impracticable.

12  As of August 4, 2022, the record date to vote on the Merger, there were 61,732,943 shares

13  of Zendesk common stock outstanding, held by hundreds to thousands of individuals and

14  entities throughout the country. The actual number of former public stockholders of

15  Zendesk will be ascertained through discovery;

16          (b)b.    Therethere are questions of law and fact that are common to the Class that

17  predominate over any questions affecting only individual members, including the

18  following:

19              i.    whether Defendants have misrepresented or omitted material

20  information concerning the Merger in the Proxy, in violation of Section 14(a) of

21  the Exchange Act;

22              ii.    whether the Individual Defendants have violated Section 20(a) of

23  the Exchange Act; and

24              iii.    whether the Class suffered damages.

25          (c)c.    Plaintiffs are adequate representatives of the Class, have retained competent

26  counsel experienced in litigation of this nature, and will fairly and adequately protect the

27  interests of the Class;

28

1    (d)d.    Plaintiffs' claims are typical of the claims of the other members of the Class,

2    and Plaintiffs do not have any interests adverse to the Class;

3    (e)c.    Thethe prosecution of separate actions by individual members of the Class

4    would create a risk of inconsistent or varying adjudications with respect to individual

5    members of the Class, which would establish incompatible standards of conduct for the

6    party opposing the Class;

7    (f)f.    Defendants have acted on grounds generally applicable to the Class with

8    respect to the matters complained of herein, thereby making appropriate the relief sought

9    herein with respect to the Class as a whole; and

10    (g)g.    Aa class action is superior to other available methods for fairly and

11    efficiently adjudicating the controversy.

12    **SUBSTANTIVE ALLEGATIONS**

13    I.    **Zendesk's Background and Resilient Business Model, Strong Performance, and**

14    **Substantial Prospects for Future Growth**

15    29.62.  Zendesk was founded in 2007. Zendesk provides software-as-a—service first

16    ("SAAS") products related to customer relationship management (CRM) company, built to give

17    organizations of all sizes, in every industry, the ability to deliver a transparent, responsivesupport,

18    sales, and empoweringother customer experience.communications. The Company's platform

19    allowedallows organizations to deliver omnichannel customer service and customize and build

20    apps across the customer journey. Zendesk evolved its offerings over time to product and

21    platform solutions that worked together to help organizations understand the broader customer

22    journey and improve communications across all channels.

23    30.    The Company's platform solution offered a customizable front-end portal,

24    live chat features, and integration with applications like Salesforce and Google Analytics.

25    Zendesk was used across a wide range of vertical markets including technology,

26    government, media, and retail, from small to large.

27    31.63.  Zendesk's online customer portal helped support agents to keep track of tickets

28    raised and their status. Customers went through existing tickets to find answers from queries

18

1    similar to their question and, if not satisfied, customers could raise their own tickets in the portal.

2    Zendesk also offered branding of support pages with business logos, themes, and brand images.

3    32.64.  Much of Zendesk's success was attributed to its continuous innovation, building

4    upon its market leadership on a global scale. This was most recently observed in the rapid growth

5    of the Zendesk Suite product, solving the long-standing pricing and packaging friction that had

6    stunted customer expansion, as well as the success in moving up-market into the enterprise

7    segment – now a segment with more than $600 million in annual recurring revenue ("ARR") and

8    growing about 50%.

9    33.65.  Prior to the Merger, the CompanyZendesk saw tremendous ten-year growth with

10   around 100,000 customers in 150 countries. By the end of 2021, approximately 5,860 employees

11   worked for the Company.

12   34.66.  Zendesk's strong financial performance leading up to the Merger positioned the

13   Company to deliver long-term shareholder growth.

14   35.    InFor example, in the Company's February 10, 2022, earnings call for Q4

15   of 2021 Earnings Call, CEO, Defendant Svane, the Company's CEO, was clear that

16   Zendesk's business model positioned the Company for Zendesk was experiencing

17   significant success in, despite the economic environment. He stated that: "2021 was a

18   great year for our business… [Zendesk] finished with a strong fourth quarter with revenue

19   of $375 million. [Zendesk is] growing that 32% year-over-year. For the full year 2021,

20   revenue grew 30% to $1.34 billion, exceeding the outlook that [Zendesk] gave at the start

21   of the year."

22   36.67.  Additionally, according to Zendesk's CFO Shelagh Glaser, Zendesk's CFO,

23   ("Glaser"), the Company "generated $375 million in revenue this quarter, 32% year-over-year

24   growth, which was ahead of our expectation. For the full year, revenue grew 30% to $1.34 billion,

25   significantly better than the outlook we provided at the start of the year."

26   37.    In fact, on October 28, 2021, Zendesk announced its proposed acquisition

27   of Momentive Global Inc. (the "Momentive Transaction"), revealing its capacity to

28   expand.

68.     In the same call, Defendant Svane also highlighted the Company's ARR metric, noted that the Company's "ability to retain and expand [its] existing customers ha[d] never been stronger," and stated that "the compelling adoption of Suite and [the Company's] momentum in the enterprise means [the Company] ha[d] **an extremely strong foundation for continued long-term growth."**

69.     CFO Glaser elaborated:

As more of our ARR comes from Enterprise customers and customers on Suite, we've seen **meaningful improvements in the fundamentals of our business**. In the fourth quarter, our average deal size as well as our average length of contracts with our customers both increased compared to last year, and our ability to retain and expand these customers are at all-time highs. New customers this quarter continued to generate 10x the ARR as compared to the ones that are churned off on our discontinued plans. **All of this leads to a more predictable business that is well positioned for continuing strong growth over the long term.**

~~38.~~70.  This success ~~also~~ continued into Q1 of 2022. ~~During~~In the Q1 2022 ~~Earnings Call~~earnings call on April 28, 2022, Defendant Svane was again clear that ~~Zendesk's business model~~Zendesk was positioned ~~the Company~~ for continued success. ~~~~According to Defendant Svane, Zendesk had a "great quarter of momentum with Enterprise customers and continued growth of the Suite [product]" and "record first quarter revenue of $388 million, growing 30% year-over-year and adding over $90 million of revenue compared to last year, *~~our~~[Zendesk's] largest ever one-year increase* for the first quarter~~. This also~~." The quarter "marked the fourth consecutive quarter that ~~we have grown our~~[Zendesk grew its] builder business by more than 30%."

71.     ~~Further emphasized by CFO Glaser, the Company was resilient in that it outperformed its initial expectations regarding free cash flow. At the Q4 2021 Earnings Call~~Svane further noted in his prepared remarks that "Suite customers are expanding at a much faster rate than [] non-Suite customers . . . [were] faster at adopting modern digital channels and extending the use of Zendesk within their organizations . . . lead[ing] to stronger expansion, better retention, longer contract terms and lower churn contraction[,]" giving management **"confiden[ce] that Suite is enhancing the sustainable long-term growth trajectory of the [C]ompany."** Later, during the question-and-answer segment of the call, Svane further noted that

the Company "still [had] a big part of [its] customer base that [it] c[ould] still migrate to Suite" and that the Company would "continue to see that as a double accelerating effort" with "upsell opportunity[.]" Svane continued: "once they are Suite customers, they use much more of the product and expand much faster with the product[,] [s]o **it's kind of a flywheel effect getting the customers on Suite as it will continue to provide expansion bookings to [the] business."**

39.    During the same call, CFO Glaser stated that the Company outperformed its initial expectations regarding free cash flow. Specifically, during the Q4 2021 earnings call, she stated that free cash flow was expected to be "slightly negative in Q1 [of 2022]." However, Zendesk However, during the Q1 2022 earnings call, she noted that the Company "outperformed this initial expectation and generated $1 million in positive free cash flow during the quarter, inclusive of $13 million in vendor payments related to the terminated [Momentive] acquisition." Glaser expected revenue to continue growing, with Q2 if 2022 revenue ranging between $402 million to $408 million."

40.72.    Moreover,. Glaser also stated that Zendesk's: "first quarter non-GAAP gross margin was 82.6%, up 80 basis points year-over-year. Gross margin has continued to improve over time, driven largely by revenue scale and efficiencies in our hosting infrastructure."

41.    In light of this success in the first quarter of 2022, Glaser noted that Zendesk was "increasing [its] revenue guidance to $1.685 billion to $1.710 billion" and "increasing [its] full year free cash flow range to $175 million to $190 million."

73.    With regard to its customers, Defendant Svane stated that Zendesk grew Also during the Q1 2022 earnings call, Defendant Svane noted that Zendesk had grown its "headcount by 39% compared to the first quarter of last year, positioning us to deliver even stronger results for 2022 and beyond." Relatedly, Glaser stated that Zendesk was "pleased with [its] ability to onboard and retain talent, which will drive our growth plan. As we fully onboard these new employees and scale our business, we remain confident, committed with a clear line of sight to 7.5% non-GAAP operating margin, which is the guidance that we had originally introduced in the November Investor Meeting."

42.74.  According to CFO Glaser, Zendesk wasAccording to Glaser, Zendesk was also "pleased with the progress with upmarket customers, as well as the initial data [they] are seeing from Suite customers." Furthermore, Glaser stated that, "over the past six months, [Zendesk] increased the number of customers that are generating more than $1 million in ARR from 111 at the end of Q3, 2021, to 140 at the end of the first quarter, up 26% in just two quarters and 65% year-over-year."

75.    In further support of the Company's positive performance**In light of this success in the first quarter, Zendesk "*increase[ed]* [its] revenue guidance to $1.685 billion to $1.710 billion" and "*increase[ed]* [its] full year free cash flow range to $175 million to $190 million."**

76.    Similarly, in the June 9, 2022 letter to shareholders announcing the completion of the Company's strategic review, the Company touted its "compounded 40% revenue CAGR since its IPO, driven by attractive revenue growth at significant scale with improving operating leverage, profitability and cash flow" and that management "remain[ed] fully committed to executing on its strategic plan and delivering on its long-term growth and profitability goals."

43.1.   , Glaser stated that Zendesk was "pleased with [its] ability to onboard and retain talent, which will drive our growth plan. As we fully onboard these new employees and scale our business, we remain confident, committed with a clear line of sight to 7.5% non-GAAP operating margin, which is the guidance that we had originally introduced in the November Investor Meeting."

77.    Defendant Svane reiterated this optimism about the Company's prospects in Zendesk's June 9, 2022, press release, stating that::
44.
    In response to investor input and our own self-assessments following the termination of our proposed acquisition of Momentive, our Board decided it was in the best interest of our stockholders to assess all opportunities to enhance stockholder value. The process did not yield any actionable options for Zendesk, and our Board unanimously determined that the right path to sustainably grow stockholder value lies in advancing Zendesk as an independent business.

    In addition, the Board and management believed that it was imperative for Zendesk to make this announcement to be transparent with our employees, customers, partners and investors regarding the execution and outcome of the strategic review, given the significant market speculation over the past several months. Our business

is built on a strong foundation of delivering products that make it easier for businesses and customers to create better relationships. We remain as committed as ever to this and to serving all of our stakeholders.

78.    Similarly, on July 28, 2022, **after** the announcement of the Merger Agreement and barely a month after management prepared the pessimistic Fairness Opinion Projections (discussed further below), Zendesk announced that Q2 2022 revenue had *increased* 28% year-over-year to $407.2 million, and Q2 2022 non-GAAP operating income was $23.6 million. Both

| | FY21E | FY22E | FY23E | FY24E | FY25E |
|---|---|---|---|---|---|
| | | | (in millions) | | |
| Revenue | $1,333 | $1,695 | $2,144 | $2,702 | $3,377 |
| Non-GAAP Operating Income(1) | $ 100 | $ 127 | $ 182 | $ 284 | $ 422 |
| Unlevered Free Cash Flow (incl. SBC)(2) | $ (53) | $ (46) | $ (34) | $ (24) | $ 27 |

(1)    Non-GAAP Operating Income, a non-GAAP financial measure, is calculated by starting with GAAP operating income (loss) and adjusting to exclude share-based compensation, employer tax related to employee stock transactions, amortization of purchased intangibles, acquisition-related expenses, amortization of share-based compensation capitalized in internal-use software and real estate impairments.

(2)    Unlevered free cash flow, a non-GAAP financial measure, is calculated by starting with Non-GAAP Operating Income and adjusting to include cash taxes paid, capital expenditures, and share-based compensation and exclude depreciation and amortization, changes in net working capital and deferred revenue, and amortization of deferred costs.

metrics were at the high end of the Company's guidance provided on the Q1 2022 earnings call held on April 28, 2022. Zendesk's bookings metrics are directly tied to its revenues, a fact that appeared in previous earnings releases but was conspicuously omitted from the Q2 earnings release. Moreover, in Q2 2022, non-GAAP gross margin improved one percentage point (from 81% to 82%) from the year prior, and free cash flow margin improved to 10% during the quarter from 7% from the year prior.

79.    In sum, ~~after~~ the Company's record revenue production, ~~repeated optimistic~~the statements made by Defendant Svane and CFO Glaser ~~in the Company's Q4 2021 and Q1 2022 Earnings Calls~~, and high analyst expectations~~, Zendesk~~ all contradict the downward adjustments made to the March 2022 Case in the Fairness Opinion Projections.

**II.    Defendants Reduced the March 2022 Case and Created the Fairness Opinion Projections to Justify the Merger Consideration**

80.    In October 2021, in connection with the Company's entry into and solicitation of support for the Momentive Transaction, "Zendesk management [] prepared certain unaudited prospective financial information of Zendesk on a standalone basis for fiscal years 2021 through 2025" (previously defined as the "Momentive Transaction Projections"). The Momentive

Transaction Projections are reproduced below:

81.    Based on the Momentive Transaction Projections, Goldman Sachs performed a DCF analysis of Zendesk as a standalone company and **derived an illustrative value of Zendesk ranging from $130 to $197 per share**.[3]

45.82. After the Momentive Transaction was rejected by shareholders had strong cause for optimism about the Company's ability to deliver a share price reflective of its expanding userbase, adaptable and resilient business model, and innovative technology. Yet, the Merger Consideration severely undervalued, and in connection with the Board's decision to start a sales process for the Company. in response to JANA's ongoing proxy contest, on March 30, 2022, management prepared the March 2022 Case. The March 2022 Case was thereafter updated and confirmed by the Board in May 2022 and provided to potential bidders as part of the sales process. The March 2022 Case is reproduced below:

**II.    Defendants Created and Approved the Unreasonably Low Fairness Opinion Projections to Justify the Unfair Merger Consideration**

46.    The unreasonably low Fairness Opinion Projections were drastically reduced from the legitimately prepared March 2022 Case, which does not square with the Company's strong financial results and management optimism regarding Zendesk at the time (as outlined above).

---

[3]    Goldman Sachs also performed "an illustrative analysis of the implied present value of an illustrative future value per share of Zendesk common stock, which is designed to provide an indication of the present value of a theoretical future value of a company's equity as a function of such company's financial multiples" using the Company's standalone forecast and derived "a range of implied present values per share of Zendesk common stock of $149 to $212."

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

47.    ~~In   March   of   2022,   the   Company's   management   prepared   the   Original   March 2022 Case, later updating it in May of 2022, resulting in creation of the March 2022 Case. A summary of the March 2022 Case was disclosed in the Proxy as follows:~~ Then, on

*March 2022 Case*
($ in millions)

| | FY2022E | FY2023E | FY2024E | FY2025E | FY2026E | FY2027E | FY2028E | FY2029E | FY2030E | FY2031E |
|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | $1,715 | $2,172 | $2,743 | $3,423 | $4,255 | $5,255 | $6,453 | $7,872 | $9,549 | $11,507 |
| **Operating Income (non-GAAP)**[1] | $ 137 | $ 185 | $ 288 | $ 428 | $ 596 | $ 814 | $1,097 | $1,417 | $1,814 | $ 2,301 |
| **Unlevered Free Cash Flow**[2] | $ 217 | $ 260 | $ 384 | $ 545 | $ 747 | $ 998 | $1,314 | $1,672 | $2,109 | $ 2,640 |
| **Unlevered Free Cash Flow (Incl. SBC)**[3] | $ (66) | $ (88) | $ (41) | $ 31 | $ 109 | $ 262 | $ 476 | $ 727 | $1,059 | $ 1,489 |

*June 2022 Case*
($ in millions)

| | FY2022E | FY2023E | FY2024E | FY2025E | FY2026E | FY2027E | FY2028E | FY2029E | FY2030E | FY2031E |
|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | $1,674 | $1,961 | $2,363 | $2,881 | $3,483 | $4,176 | $4,965 | $5,854 | $6,844 | $7,932 |
| **Operating Income (non-GAAP)**[1] | $ 138 | $ 167 | $ 248 | $ 360 | $ 488 | $ 647 | $ 844 | $1,054 | $1,300 | $1,586 |
| **Unlevered Free Cash Flow**[2] | $ 216 | $ 249 | $ 345 | $ 472 | $ 629 | $ 815 | $1,039 | $1,278 | $1,556 | $1,875 |
| **Unlevered Free Cash Flow (Incl. SBC)**[3] | $ (60) | $ (65) | $ (21) | $ 40 | $ 106 | $ 230 | $ 394 | $ 576 | $ 803 | $1,082 |

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

*March 2022 Case*
($ in millions)

| | FY2022E | FY2023E | FY2024E | FY2025E | FY2026E | FY2027E | FY2028E | FY2029E | FY2030E | FY2031E |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | $1,715 | $2,172 | $2,743 | $3,423 | $4,255 | $5,255 | $6,453 | $7,872 | $9,549 | $11,507 |
| Operating Income (non-GAAP)[1] | $ 137 | $ 185 | $ 288 | $ 428 | $ 596 | $ 814 | $1,097 | $1,417 | $1,814 | $ 2,301 |
| Unlevered Free Cash Flow[2] | $ 217 | $ 260 | $ 384 | $ 545 | $ 747 | $ 998 | $1,314 | $1,672 | $2,109 | $ 2,640 |
| Unlevered Free Cash Flow (Incl. SBC)[3] | $ (66) | $ (88) | $ (41) | $ 31 | $ 109 | $ 262 | $ 476 | $ 727 | $1,059 | $ 1,489 |

83.    As is apparent, the March 2022 Case – which, again, was updated and confirmed in May 2022 – projected **higher** revenues in each year of the projection period than the Momentive Transaction Projections:



Momentive Transaction Projections vs. March 2022 Case - Revenue

In other words, as of May 2022, the Board projected that the Company would do better – not worse – than it was projected to do in the Momentive Transaction Projections, based on which Goldman Sachs valued the Company as high as $197 per share.

84.    As outlined above, in the period between the creation of the Momentive Transaction Projections and the March 2022 Case, and thereafter, management was publicly touting the Company's earnings and prospects for continued growth, and management *increased* the Company's previously provided guidance.

85.    On June 22, 2022, management – one day after JANA indicated that it would terminate its proxy contest upon an announcement of the Merger, and barely one month after the Board updated and confirmed the March 2022 Case – management presented the downwardly revised to the Board the Fairness Opinion Projections (dubbed the June 2022 Case or in the Proxy). The Fairness Opinion Projections (as shown are reproduced below) to:

**June 2022 Case**
($ in millions)

|  | FY2022E | FY2023E | FY2024E | FY2025E | FY2026E | FY2027E | FY2028E | FY2029E | FY2030E | FY2031E |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | $1,674 | $1,961 | $2,363 | $2,881 | $3,483 | $4,176 | $4,965 | $5,854 | $6,844 | $7,932 |
| Operating Income (non-GAAP)[1] | $ 138 | $ 167 | $ 248 | $ 360 | $ 488 | $ 647 | $ 844 | $1,054 | $1,300 | $1,586 |
| Unlevered Free Cash Flow[2] | $ 216 | $ 249 | $ 345 | $ 472 | $ 629 | $ 815 | $1,039 | $1,278 | $1,556 | $1,875 |
| Unlevered Free Cash Flow (Incl. SBC)[3] | $ (60) | $ (65) | $ (21) | $ 40 | $ 106 | $ 230 | $ 394 | $ 576 | $ 803 | $1,082 |

86.    The Fairness Opinion Projections represented a **significant reduction** from the Board, Momentive Transaction Projections and the March 2022 Case (which was approved by, again, had been updated and confirmed in May 2022):

| (in millions) |  | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Momentive Transaction Projections | Revenue | $1,695 | $2,144 | $2,702 | $3,377 |  |  |  |  |  |  |
|  | Non-GAAP Operating Income | $ 127 | $ 182 | $ 284 | $ 422 |  |  |  |  |  |  |
|  | Unlevered Free Cash Flow (incl. SBC) | $ (46) | $ (34) | $ (24) | $ 27 |  |  |  |  |  |  |
| March 2022 Case | Revenue | $1,715 | $2,172 | $2,743 | $3,423 | $4,255 | $5,255 | $6,453 | $7,872 | $9,549 | $11,507 |
|  | Non-GAAP Operating Income | $ 137 | $ 185 | $ 288 | $ 428 | $ 596 | $ 814 | $1,097 | $1,417 | $1,814 | $ 2,301 |
|  | Unlevered Free Cash Flow (incl. SBC) | $ (66) | $ (88) | $ (41) | $ 31 | $ 109 | $ 262 | $ 476 | $ 727 | $1,059 | $ 1,489 |
| June 2022 Case | Revenue | $1,674 | $1,961 | $2,363 | $2,881 | $3,483 | $4,176 | $4,965 | $5,854 | $6,844 | $ 7,932 |
|  | Non-GAAP Operating Income | $ 138 | $ 167 | $ 248 | $ 360 | $ 488 | $ 647 | $ 844 | $1,054 | $1,300 | $ 1,586 |
|  | Unlevered Free Cash Flow (incl. SBC) | $ (60) | $ (65) | $ (21) | $ 40 | $ 106 | $ 230 | $ 394 | $ 576 | $ 803 | $ 1,082 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue Percent change from March 2022 Case | -2% | -10% | -14% | -16% | -18% | -21% | -23% | -26% | -28% | -31% |
| Non-GAAP Operating Income Percent change from March 2022 Case | 1% | -10% | -14% | -16% | -18% | -21% | -23% | -26% | -28% | -31% |
| Unlevered Free Cash Flow Percent change from March 2022 Case | 9% | 26% | 49% | 29% | -3% | -12% | -17% | -21% | -24% | -27% |

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934





48.87.  On June 22, 2022, the Board that **same day** that they **first** reviewed the Fairness Opinion Projections, the Board immediately approved the Fairness Opinion Projections for use by Qatalyst Partners and Goldman Sachs in rendering their respective fairness opinions. However, the Proxy entirely omitted any information that explained or justified management's significant reduction of the March 2022 Case to create the June 2022 Case.

1  49.88.  ~~As evinced by the tables above, the June 2022 Case was far more conservative than~~

2  ~~the March 2022 Case. Indeed, the downward revision of the Company's projected Unlevered~~

3  ~~Free Cash Flows from the March 2022 Case to the June 2022 Case had the effect of directly~~

4  ~~reducing~~Extended out to 2031, these downward revisions had a substantial negative impact on

5  the Company's projected free cash flow. This, in turn, directly reduced the Company's implied

6  equity value under ~~the discounted cash flow~~a DCF analysis – the most important valuation

7  method Qatalyst ~~Partners~~and Goldman Sachs used to value the Company.[~~2 3 4~~] As the technique's

8  name suggests, a ~~discounted cash flow~~DCF analysis calculates the value of a business based

9  ~~upon~~on the present value of the business's projected future free cash flows.

10

11  _____

12  [~~2~~]  ~~"Discounted cash flow (DCF) forms the core of finance…. Though professionals may~~
   ~~employ other methods of valuation, such as relative valuation and the contingent claims~~

13  ~~approach, DCF forms the basis for all other valuations. Underscoring the importance of~~
   ~~DCF valuation is the fact that it provides a linchpin to link various fields of finance."~~

14  ~~"Developing an Automated discounted Cash Flow Model." The Valuation Handbook:~~
   ~~Valuation Techniques from Today's Top Practitioners. Ed. Rawley Thomas and Benton E.~~

15  ~~Gup. Hoboken: John Wiley & Sons, 2010. 110.~~
   [~~3~~]  ~~"While discounted cash flow valuation is only one of the three ways of approaching~~

16  ~~valuation and most valuations done in the real world are relative valuations, it is the~~
   ~~foundation on which all other valuation approaches are built. To do relative valuation~~

17  ~~correctly, we need to understand the fundamentals of discounted cash flow valuation. This~~
   ~~is why so much of this book focuses on discount cash flow valuation." Damodaran,~~

18  ~~Aswath. "Approaches to Valuation." Investment Valuation. 2nd ed. 11.~~
   [~~4~~]  ~~"In finance theory, present value models [also referred to as discounted cash flow~~

19  ~~models] are considered the fundamental approach to equity valuation." CFA® Program~~
   ~~Curriculum 2015 • Level II • "Volume 4: Equity." CFA Institute, 2014.~~

20  [4]  "Discounted cash flow (DCF) forms the core of finance….Though professionals may employ

21  other methods of valuation, such as relative valuation and the contingent claims approach, DCF
   forms the basis for all other valuations. Underscoring the importance of DCF valuation is the fact

22  that it provides a linchpin to link various fields of finance." "Developing an Automated discounted
   Cash Flow Model." *The Valuation Handbook: Valuation Techniques from Today's Top*

23  *Practitioners*. Ed. Rawley Thomas and Benton E. Gup. Hoboken: John Wiley & Sons, 2010. 110.
   "While discounted cash flow valuation is only one of the three ways of approaching valuation and

24  most valuations done in the real world are relative valuations, it is the foundation on which all
   other valuation approaches are built. To do relative valuation correctly, we need to understand the

25  fundamentals of discounted cash flow valuation. This is why so much of this book focuses on
   discount cash flow valuation." Damodaran, Aswath. "Approaches to Valuation." *Investment*

26  *Valuation*. 2nd ed. 11. "In finance theory, present value models [also referred to as discounted cash
   flow models] are considered the fundamental approach to equity valuation." CFA® Program

27  Curriculum 2015 • Level II • "Volume 4: Equity." CFA Institute, 2014.

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

50.89.  Due to the method's operation, a discounted cash flowDCF analysis is acutely sensitive to small differences in the underlying financial inputs affecting a Company's projected future cash flows, particularly to the extent these inputs alter the growth rate of projected cash flows. As explained by a highly respected professor with expertise in the study of M&A transactions:

> [A] discounted cash flow analysis is conducted by discounting back at a chosen discount rate the projected future free cash flows and terminal value of an asset. In performing this analysis there are three central choices, which must be made, each of which can significantly affect the final valuation.   These are the correct forecasted free cash flows to utilize, the appropriate discount rate, and the terminal value of the asset. There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. […]

> This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.[5]

90.     HereUsing these reduced projections as the basis for their DCF analyses, Goldman Sachs and Qatalyst thereafter calculated implied valuations for Zendesk for just $66 to $116 and $58.27 to $96.42 per share, respectively, using a DCF analysis.

51.91.  In short, the severe reductions to Zendesk's Unlevered Free Cash Flow projections from the March 2022 Case to the June 2022 CaseFairness Opinion Projections resulted in a lower implied value for the Company, enabling Defendants to mislead shareholders into accepting an inadequate Merger Consideration for their shares.

## III.    The Unreasonably Low Fairness Opinion Projections Were the Result of a Flawed and Conflicted Sales Process Fueled by the Individual Defendants' Self-Interests

52.92.  Two main motivations guided the Individual Defendants' false and misleading actions: (1) in response to the failed Momentive Transaction in February of 2022, Jana Partners LLC ("Jana"), a significant shareholder of Zendesk at the time, threatened Zendesk with a

---

[5] Steven M. Davidoff, Fairness Opinions, 55 AM. U. L. REV. 1557, 1573-78 (2006).

[5]     Steven M. Davidoff, *Fairness Opinions*, 55 AM. U. L. REV. 1557, 1573-78 (2006).

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

Defendants created the downwardly-revised Fairness Opinion Projections to justify the unfair Merger Consideration for two primary reasons: (1) to effectuate a sale and end JANA's ongoing proxy contest ~~to replace the Board~~; and (2) ~~realizing there would be an inevitable sale of Zendesk, the Individual Defendants wanted~~ to ensure the beneficial treatment of ~~their own~~ the Individual Defendants' equity awards in that sale.

### ~~A.     Jana Threatens Zendesk with a Proxy Contest~~

### A.     The Board Reduced the Projections to Effectuate the Sale JANA Demanded

~~53.~~93.  On October 28, 2021, Zendesk announced its proposed acquisition of Momentive, which was widely and publicly condemned by shareholders.

94.     In connection with the Company's entry into and solicitation of support for the Momentive Transaction, Zendesk management prepared the Momentive Transaction Projections and Goldman Sachs – who was also advising the Company in connection with the Momentive Transaction – **valued Zendesk from $130 to $197 per share (with a midpoint of $163.50)** using the Momentive Transaction Projections.

95.     The Momentive Transaction was widely and publicly condemned by shareholders, and, after its announcement, Zendesk's stock price plunged and the stock received multiple downgrades from market analysts.

~~54.~~96.  Following the announcement of the Momentive Transaction and ~~the~~ ensuing decline in stock price and market capitalization, ~~Jana~~JANA publicly lambasted the Company's management and Board, noting in part:

> Zendesk is highly undervalued and has far more attractive opportunities to create shareholder value . . . the proposed Momentive acquisition lacks financial merit, has questionable strategic logic, and introduces a high degree of execution risk for Zendesk shareholders. . . . The proposed acquisition of Momentive . . . has led to a more than 20% decline in the Company's stock price in just a few weeks . . . [which] has erased approximately $3 billion of value from Zendesk's market capitalization, or roughly the entire purchase price being paid to acquire Momentive…
>
> The decline in the Company's value is all the more staggering considering Zendesk announced the acquisition along with reporting strong quarterly results that led every sell side analyst to increase their standalone growth assumptions for the Company and should have otherwise led to a significant increase in its stock price. . . .

31

The glaring red flags surrounding the proposed acquisition of Momentive leave us questioning whether the transaction is motivated by other more problematic factors. Is this an attempt to ward off acquisition interest in Zendesk given its discounted valuation and history of spurning prior interest? Was this motivated by the Zendesk CEO's friendship with the CEO of Momentive? Or is the [B]oard simply not sufficiently engaged to appropriately safeguard shareholder interests?

~~Jana~~JANA concluded its letter by noting that, while it "prefer[ed] to work collaboratively~~" but~~," it was "putting the [B]oard on notice . . . that [Jana] **would not hesitate to seek to replace [B]oard members** that disenfranchise shareholders in order to consummate" the Momentive Transaction.

97.    The Momentive Transaction was likewise opposed by certain Momentive shareholders, who expressed concerns regarding the process that culminated in the deal, leading one market commenter to speculate that the Momentive Transaction was "so bad that it could possibly be one of the few, if any, mergers in history to be voted down by both sides," and which could lead to further trouble for the Board at the hands of ~~Jana:~~JANA:

55.
Just terminating [the Momentive Transaction] alone should create tremendous value for shareholders. Once that happens, the second thing [~~Jana~~JANA] could do to create shareholder value like they have done in many other companies is bringing an experienced and fresh perspective to the [B]oard. . . . As [~~Jana~~JANA] does with most of their active engagements, and as they allude to in their letter, they are working with a team of public company directors and executives with relevant industry experience who would likely be excellent board candidates.

The company's CEO, Mikkel Svane, is also its founder, and he is clearly brilliant but he might not be the best person to run the day-to-day operations of a public company. Moreover, the lead director, Carl Bass, is not a fan of activists: When engaged by activists as CEO of Autodesk he called them sports fans who think they know more than the coaches and owners. Less than one year later, he was no longer CEO of Autodesk. **If he is not careful, he can experience a similar outcome here as he is up for re-election in 2022.**

The best thing the [B]oard can do for itself is promptly decide to terminate the merger agreement as a response to the will of the shareholders. **If instead the agreement is terminated because shareholders vote against it, as it appears it will be, history has shown that this is a big endorsement for the activist and against management and will allow the activist to walk on to the [B]oard next annual meeting if they choose to do so.** Further, at last year's annual meeting there were already signs of shareholder discontent – Hilarie Koplow-McAdams and Michelle Wilson, two of the three directors voted on, received 40.04% and 37.43% of votes against them.

**This situation would lead to the third value creation opportunity here—a sale of the [Company] to a strategic.** Back in 2016, when Salesforce board member Colin Powell's email was hacked it was disclosed that Zendesk was on Salesforce's M&A target list but that their view was that the Zendesk CEO was not interested in selling. Likewise, private equity has shown interest with nothing to show for it. **Well, an activist involved generally puts a company in pseudo-play, and a board that is on the precipice of losing a proxy fight suddenly gets incentivized to sell the company if they think they are going to be out one way or the other.**[66]

~~56.~~98.  Despite this public opposition, the Company did not terminate the Momentive Transaction ~~and~~.  Instead, the Board determined to have shareholders vote on ~~it~~ the transaction at a special meeting on February 25, 2022.

~~57.~~99.  ~~Meanwhile, as predicted, with Jana's threat of a proxy contest looming, the Consortium saw blood~~Clearly seeing value left on the table in the ~~water and~~Momentive Transaction, and while the vote on the Momentive Transaction was still pending, on February 7, 2022, the Consortium sent the Board an unsolicited acquisition proposal for the potential acquisition of the Company at ~~a~~an indicative price range ~~of~~between $127~~-$~~.00 and $132.00 per share in cash~~.~~ – nearly double the Merger Consideration, and in line with Goldman Sachs' $130-$197 per share valuation range of Zendesk in connection with the Momentive Transaction.

~~58.~~100.      Two days later, on February 9, 2022, the Board met with Goldman Sachs (who at the time was Zendesk's financial advisor in connection with the Momentive Transaction) to discuss the Consortium's proposal. The Board ~~decided~~determined that the Consortium's ~~proposal  **representing nearly double the Merger Consideration**~~  "$127.00 and $132.00 per share offer "**significantly undervalued Zendesk and that it was not in the best interests of Zendesk and its stockholders to alter Zendesk's existing strategic plan and pursue the proposed transaction with the Consortium."**

---

[6] ~~See Kenneth Squire, *Jana Partners may have a three-pronged plan to build value at Zendesk*, CNBC Delivering Alpha, Dec. 4, 2021, available at: https://www.cnbc.com/2021/12/04/jana-partners-may-have-a-threepronged-plan-to-build-value-at-zendesk.html.~~

[6]   *See* Kenneth Squire, *Jana Partners may have a three-pronged plan to build value at Zendesk*, CNBC Delivering Alpha, Dec. 4, 2021, available at: https://www.cnbc.com/2021/12/04/jana-partners-may-have-a-threepronged-plan-to-build-value-at-zendesk.html.

59.101.       On February 10, 2022, the Company publicly announced its rejection of the Consortium's proposal.

60.102.       Clearly frustrated, on February 16, 2022, JanaJANA sent another scathing letter to the Board, in which it publicly announced its intention to nominate four directors for election to the Board at the 2022 annual stockholder meeting.

> Zendesk's . . . lengthy effort to win support for the Momentive acquisition has been met by vociferous and sustained rebuke. Jana [], other shareholders and sell-side analysts have criticized and opposed the acquisition. Last Friday we were joined by leading independent proxy advisory firms ISS and Glass Lewis, both of which advised Zendesk shareholders to vote AGAINST the transaction. With the February 25th vote fast approaching, we believe Zendesk shareholders will finally be able to save themselves from their own [B]oard by voting down the Momentive transaction.
>
> However, lasting damage has been done. We believe the [B]oard has all but assured that Zendesk will suffer a persistent discount to its intrinsic value. The [B]oard has shown a reckless disregard for shareholder capital, a seeming readiness to resort to *"questionable reasoning"*[] when challenged, and most recently reinforced concerns about its history of refusing to engage with interested strategic and financial buyers for the Company. With the current [B]oard at the helm, we believe shareholders are perpetually in danger of what Glass Lewis characterized as the [B]oard's *"ready, fire, aim"*[] process.
>
> **To address the damage Zendesk's [B]oard has already inflicted on shareholders and to protect against further harm, we believe the [B]oard must either be replaced with capable fiduciaries or reverse course and engage with interested strategic and financial buyers to sell the Company**. (emphasis in original).

(emphasis in original).

61.103.       Thereafter, during the period prior to the February 25, 2022 special meeting of Zendesk stockholders held in connection with the Momentive Transaction, the Board and the Company's management met with certain Company shareholders, including JanaJANA, to discuss, among other things, the Momentive Transaction, governance matters, and the Consortium's proposal.

62.104.       On February 25, 2022, prior to the shareholder vote on the Momentive Transaction, JanaJANA released one moreanother statement encouraging Zendesk shareholders to vote against the Momentive Transaction, andtransaction, noting in part that "a rejection of the

proposed Momentive acquisition would be a huge win for Zendesk shareholders, a repudiation of Zendesk's [B]oard, and a strong indication that Zendesk either requires significant [B]oard change or should be sold." ~~Jana~~JANA further chastised the Board for "burn[ing] tens of millions of dollars of shareholder capital pursuing Momentive, erod[ing] the [C]ompany's own credibility, and distract[ing] the [C]ompany from its attractive standalone prospects, while at the same time refusing to engage with buyers interested in acquiring Zendesk at a premium."

~~63.~~105.    Later ~~that day~~on February 25, 2022, Zendesk shareholders voted overwhelmingly against the Momentive Transaction, and the transaction was thereafter terminated.

106.    Three days later, on February ~~28th, Jana~~28, JANA sent another letter to the Board, noting in part:
~~64.~~
> At Friday's extraordinary shareholder meeting, Zendesk's [B]oard received the lowest level of support of any disclosed deal-related shareholder vote (buyer or seller) in the Russell 3000 in the last 20 years (and possibly ever), garnering only 9% support (which would have been even lower excluding the roughly 3% held by management and other insiders). . . . We believe it could not be any clearer that Zendesk's [B]oard is disengaged and totally out of touch with shareholder priorities, lacks the requisite skillset to govern the [C]ompany on their behest and/or simply does not care enough to consider them. . . . **We believe Zendesk requires either significant [B]oard change, or in the absence of such change, should be sold.**[7]

107.    **In short, JANA was clear: the Board could either sell the Company, or it would be removed. The Board chose the former, to shareholders' detriment.**

~~65.~~108.    With a proxy contest underway, on March 7, 2022, the Board met with Qatalyst ~~Partners~~ – which was engaged to help the Board resolve the proxy contest with ~~Jana~~ JANA – to discuss "a range of potential strategic alternatives." Following discussion, and plainly

---

[7] ~~Notably, Jana's letter also referenced a profanity-laced December 4, 2021, email from lead independent director Defendant Bass in response to CNBC contributor Kenneth Squire following Mr. Squire's opinion piece of the same date, *see supra* note 6. Jana noted that the email "appear[ed] to be part of a pattern of hostility towards other points of view."~~

[7]    Notably, JANA's letter also referenced a profanity-laced December 4, 2021, email from lead independent director Defendant Bass in response to CNBC contributor Kenneth Squire following Mr. Squire's opinion piece of the same date, *see supra* note 6. JANA noted that the email "appear[ed] to be part of a pattern of hostility towards other points of view."

in response to ~~Jana's~~JANA's pending proxy contest, the Board "determined to explore more intensively a potential process to review strategic alternatives for Zendesk" – a euphemism for a sales process – and authorized Qatalyst ~~Partners~~ to contact potential counterparties, including the Consortium, in connection with their interest in a ~~transaction~~sale. ~~Importantly~~

~~66.~~109.    In connection with the Board's newfound interest in selling the Company, **and despite having just prepared the Momentive Transaction Projections**, on March 30, 2022, ~~and again plainly in contemplation of a sales process,~~ management discussed with the Board a new proposed long-range plan through calendar year ~~2025 for~~2023 that Zendesk ~~that~~ would ~~be provided~~provide to ~~potential~~ bidders in the ~~strategic review~~sales process (*i.e.,* the ~~Original~~ March 2022 Case~~)~~.

~~67.~~110.    Over the next several weeks, Zendesk management met with potential counterparties and supported due diligence efforts. ~~Meanwhile, on April 7, 2022, Defendants Bass and Koplow-McAdams, and representatives of management, met with Jana to discuss the proxy contest. Jana *again reiterated* its binary options for the Board: **a change in Board composition or a sale of Zendesk.**~~

111.    Meanwhile, the Board made one last attempt to stave off JANA's proxy contest. On April 7, 2022, Defendants Bass and Koplow-McAdams and members of Zendesk management met with JANA "to discuss the then current proxy contest." JANA again reiterated its binary options for the Board: a change in Board composition, or a sale.

112.    On April 18, 2022, when the Company sent a process letter to counterparties requesting preliminary indications of interest by May 5, 2022, it included "a long-range plan for Zendesk through calendar year 2025 that had been prepared by Zendesk's management" (previously defined, as updated on May 4, 2022, as the "March 2022 Case"). As noted above, the March 2022 Case – which, again, was updated and **confirmed in May 2022** – projected **higher** revenues in each year of the projection period than the Momentive Transaction Projections.

~~68.~~113.    On May 4, 2022, Qatalyst ~~Partners~~ provided to each of the remaining potential bidders in the strategic review process an updated long-range plan for Zendesk through

calendar year 2025 (*i.e.*, the March 2022 Case) that ~~was~~had been prepared by Zendesk management primarily reflecting certain changes to the ~~Original~~original March 2022 Case that was previously provided to the bidders.

114.    On May 5, 2022, the ~~Consortium submitted an updated indication~~Company received indications of interest ~~to acquire~~from the ~~Company~~ Consortium (for **$120** ~~in cash~~ **per share**~~,~~) and Bidder 2 ~~indicated an acquisition price~~(for a range of **$125 to $135 per share**~~.~~).

~~69.~~115.        The Board met the following day to discuss the bids and the key assumptions underlying the indicative valuations. Thereafter, between May 7, and May 8, 2022, Qatalyst ~~Partners~~ had multiple discussions with the Consortium and "provided guidance to the Consortium that they **would need to improve their proposed price of $120.00 per share**."

~~70.~~116.        However, by the end of May, and aware that the Board was under extreme pressure from JANA to sell, both ~~the Consortium and Bidder 2 had~~bidders significantly decreased their ~~valuations of Zendesk.~~proposals. On May 24, 2022, the Consortium notified Qatalyst ~~Partners that their financing had been withdrawn and~~ that they were lowering their valuation to $96.00 per share. On May 26, 2022, Bidder 2 likewise lowered its proposal to "as high as $110 per share."

~~71.~~    On May 27, 2022, Qatalyst ~~Partners~~ updated the Board~~,~~. Following discussion and an updated financial analysis, the Board agreed to continue discussions on Bidder 2's proposal and a potential response thereto at a meeting the next day.

117.    ~~However, also that same day~~Also on May 27, 2022, and *without any apparent instruction from the Board*, "~~"~~[Qatalyst ~~Partners~~] communicated to representatives of the Consortium that the Board [] would consider any actionable proposal, but until such time (i) would cease to engage with the Consortium because it had failed to deliver an actionable proposal and (ii) was focused on actionable proposals from other potential counterparties."

~~72.~~118.        On May 28, 2022, the Board instructed Qatalyst ~~Partners~~ to engage with Bidder 2 in an effort to improve its proposal to $115 per share. Subsequently, Bidder 2 informed the Company that it had again reduced its acquisition price range to $90-$100 per share, and might reduce it again.

73.119.     **Unsatisfied with** ~~the~~**these proposals** ~~put forth by the Consortium and Bidder 2~~ — **each of which were still significantly higher than the Merger Consideration** — **on June 6, 2022, the Board concluded that** **it was in** ~~the~~ **shareholders' best interests to terminate the sales process and** **continue executing Zendesk's plan as a stand-alone public company.**

74.120.     That same day, the Board authorized Wachtell, Lipton, Rosen & Katz ("Wachtell Lipton"), the Company's legal counsel, to engage with counsel for ~~Jana~~JANA to discuss the potential for execution of a limited-duration ~~nondisclosure agreement ("NDA")~~, in order for the Company to disclose to ~~Jana~~JANA that: (i) it intended to continue as a stand-alone company and publicly announce the end of the strategic review process, (ii) it would be scheduling its annual meeting, and (iii) it would like to discuss a potential settlement proposal concerning Jana's proxy contest.

75.121.     ~~Jana~~JANA rejected the offer to sign an NDA. Instead, on June 8, 2022, ~~Jana~~JANA issued a press release announcing its intention to sue Zendesk to compel it to schedule the 2022 annual shareholder meeting. ~~Jana's[8]~~ JANA's press release provided, in part: ~~Jana~~

> JANA also commented on today's CNBC report that a sale process conducted by the Company's Board . . . is unlikely to result in a transaction.

> Barry Rosenstein, Managing Partner of JANA, said, "Zendesk's Board has inflicted significant damage on its shareholders and **its incumbent directors must stop hiding from accountability. To protect against further value destruction, shareholders must be given the opportunity to vote on directors who will act in their best interests and restore desperately needed value and credibility.**

> "It is inexcusable that the Board has yet to set a date for its 2022 annual meeting. Given Zendesk's 2021 annual meeting was held on May 18, 2021, we intend to take legal action to compel the Company to hold its 2022 annual meeting as promptly as possible if a meeting date is not set before the June 18 deadline. **The Board must stop holding Zendesk hostage from its owners."**

> In response to today's CNBC report, Mr. Rosenstein added, "If CNBC's reporting is accurate, Zendesk shareholders should be furious. This **report of a bungled sale process**—following the Board's rejection of real interest in the Company in

---

[8]     Also on June 8, 2022, CNBC reported that Zendesk had terminated the previously rumored sale process.

February to instead pursue the ill-conceived acquisition of Momentive, which was subsequently shunned by more than 90% of Zendesk's shareholders—would be the latest catastrophic example of the **Board's inability to properly oversee management and the Company.** Zendesk's stock price today hit a new 52-week low, illustrating that shareholders have lost confidence in the Company and further underscoring how desperately change is needed."

On February 16, 2022, ~~Jana~~JANA Partners put forward four highly qualified, independent directors who are committed to improving governance and accountability at Zendesk while working to rehabilitate the Company's damaged relationship with investors. **Absent the significant boardroom change ~~Jana~~JANA has proposed to restore Zendesk's credibility, ~~Jana~~JANA believes the Company must be sold.**

~~76.~~122.        The following day, June 9, 2022, the Company issued the press release announcing that **it had completed the strategic review process, had not received any actionable proposals, and had therefore determined that remaining an independent company was in the best interest of shareholders.** The press release also announced that the Company's annual meeting was set for August 17, 2022.

~~77.~~123.        With the clock ticking, the Board ~~immediately~~ turned its attention to ~~Jana's~~JANA's proxy contest. On June 11, 2022, the Board authorized the commencement of settlement discussions with ~~Jana~~JANA, **which reportedly included the removals of ~~CEO Mikkel~~Defendant Svane (Chairman and ~~Mr.~~ CEO and a founder of Zendesk) and Bass**.

124.    ~~Again, sensing~~Meanwhile, as a result of the Momentive Transaction debacle, JANA's ensuing public proxy contest, and the publicly announced unsuccessful sales process, the Company's stock price had declined to a closing price of $59.96 per share on June 13, 2022.

125.    Sensing blood in the water, and aware of the Board's desperation, on June 8, 2022, and then again on June 14, 2022, the Consortium contacted Qatalyst "to express renewed interest" in an acquisition and indicated to Qatalyst ~~Partners~~ that it could submit an acquisition proposal as high as $82 per share, ~~if Zendesk's actual results for May 2022 were in line with expectations and subject to satisfactory responses to certain other confirmatory due diligence items. Following this outreach from the Consortium, Qatalyst Partners tried to re-engage Bidder 2 regarding an acquisition proposal. Similar to the Consortium, Bidder 2 indicated that it would need to evaluate~~

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

1  the Company's actual results for gross and net bookings for May 2022, and receive an update on

2  the Company's business momentum. .

3      78.126.        On June 17, 2022, the Consortium submitted an offer to acquire the

4  Company for *only* $75.50 per share (previously defined as the "June 1717th Proposal").[8]

5      79.127.        Following the Consortium's June 17 Proposal, Zendesk proposed a limited

6  confidentiality agreement with JanaJANA to disclose to **Jana**JANA the June 17 Proposal **in the**

7  **context of settlement discussions**. On June 18, 2022, JanaJANA agreed to enter into a

8  confidentiality agreement. The following morning, Defendant Bass and counsel met with

9  JanaJANA to discuss the Consortium's proposal. Unsurprisingly, JanaJANA expressed support

10  for Zendesk engaging with the Consortium.

11      80.128.        Following the June 17 Proposal, and with a guarantee of Jana'sAfter

12  securing JANA's support now in hand, Company management "commenced to update Zendesk's

13  long range plan" — *i.e.* lower the March 2022 Case — as the Board, the Bord determined to

14  expeditiously proceed with negotiating a definitive transaction with the Consortium at a price

15  they knew would undervalue the Company.

16      81.129.        OnBarely one week later, on June 21, 2022, the Consortium submitted its

17  "best and final" offer to acquire Zendesk for $77.50 per share. JanaJANA, who was getting the

18  sale it had publicly called for, stated thatblessed the transaction and **indicated** **it would** ~~not~~

19  ~~oppose the Merger and that it would expect to~~ **terminate its proxy contest upon** **an**

20  **announcement of the** ~~Merger.~~**transaction**.

21      130.   **The** **following** **day**, June 22, 2022 – barely **one month** after the ~~Consortium~~

22  ~~submitted its low ball "best~~Board updated and **final" offer**, ~~Zendesk~~ confirmed the March 2022

23  Case – management presented to the Board ~~the June 2022 Case, which~~an "updated" long-range

24  plan – the Fairness Opinion Projections. As noted above, the Fairness Opinion Projections

25  represented a **significant reduction** from the Momentive Transaction Projections and the March

26  [8] As part of the June 17 Proposal, the Consortium informed Zendesk that Significant LP
27  Co-Investor B and Significant LP Co-Investor C would be increasing their commitments
   and investing alongside the Consortium. It is unclear whether Qatalyst Partners – whom
28  the Consortium repeatedly asked to assist in securing financing – had a hand in these
   investors' increased commitments.

2022 Case. The (which, again, had been **updated and confirmed in May 2022**).

131.   On June 23, 2022, the **day after** they **first** reviewed the Fairness Opinion Projections, the Board immediately approved the June 2022 CaseFairness Opinion Projections for use by Qatalyst Partners and Goldman Sachs in rendering their respective fairness opinions in connection with the .

82.132.    Using these reduced projections as the basis for their DCF analyses, Goldman Sachs and Qatalyst thereafter calculated implied valuations for Zendesk of just $66 to $116 and $58.27 to $96.42 per share, respectively, using a DCF analysis, and, using those calculations, opined that the Merger.[9] was fair.[9]

133.   On June 24, 2022, and based on the significantly reduced  – one day after they approved the Fairness Opinion Projections – and now armed with the Financial Advisors' fairness opinions, the Board approved the Merger Agreement.

83.134.    **On the same day, JanaJANA withdrew its proxy contest.**[10]

84.135.    Also notably, onOn July 6, 2022, DefendantMichelle Wilson resigned from the Board, effective immediately, and Defendants Bass and Szkutak announced that they would not stand for reelection to the Board at the Company's annual meeting.

---

[9] Notably, in the two-year period ended June 24, 2022, Goldman Sachs has recognized compensation for financial advisory and/or underwriting services provided by its Investment Banking Division to the Consortium and/or its affiliates, in the aggregate of, **$268 million.**

[9]   Notably, in the two-year period ended June 24, 2022, Goldman Sachs has recognized compensation for financial advisory and/or underwriting services provided by its Investment Banking Division to the Consortium and/or its affiliates, in the aggregate of, **$268 million.**

[10] Notably, the Company has not disclosed whether Jana is receiving any additional benefits (economic or otherwise) from the Company and/or the Consortium in connection with the settlement and withdrawal of its proxy contest, a material omission considering its role in the Board's process. *See In re Am. Capital S'holder Litig.,* No. 422598-V, 2017 Md. Cir. Ct. LEXIS 4 (Jul. 12, 2017) ("There is also the issue that American Capital paid Elliot [(an activist investor)] $3 million for its role in the merger process . . . . Other than pressure to sell the company, it is not clear what Elliott brought to the table for the common stockholders. Why should the common stockholders of American Capital pay the legal fees of another stockholder, Elliott, for 'advising' the Company's board in a merger transaction if that transaction, independently considered (and vetted by two investment banks), is the product of rational business judgment?").

85. ~~The Merger Consideration represents an almost 50% reduction from the offers submitted by the Consortium and Bidder 2 only two months prior in April 2022,~~ *~~which the Board had rejected as insufficient.~~* ~~Indeed, in October 2021, in connection with its fairness opinion for the Momentive Transaction, Goldman Sachs had valued Zendesk at $176 per share, which is $98.50 higher than the Merger Consideration. Even worse, following the announcement of the Merger Agreement, which artificially capped the Company's share price, on July 29, 2022, the Company reported strong Q2 2022 results, with revenue growing 28% year-over-year and free cash flow margin expanding to 10%. Surely the Company's management was aware of these improving financial results while it was simultaneously slashing the Company's projections in anticipation of a fairness opinion.~~

136. With JANA at bay, on August 17, 2022, Zendesk held its annual shareholder meeting and the incumbent Board members up for reelection secured shareholder approval and avoided the professional embarrassment of a public ousting. The Board could see the proverbial light at the end of the tunnel (*i.e.* the Merger).

137. On August 28, 2022, Light Street – which managed funds that owned more than 2% of Zendesk – sent a letter to the Board declaring its intent to vote against the then-proposed Merger and proposing "an alternative and superior path forward for the Company's shareholders" that contemplated a recapitalization of Zendesk, the proceeds of which, together with cash on Zendesk's balance sheet, would be used to finance a $5 billion tender offer for approximately 50% of Zendesk's outstanding common shares at **$82.50 per share** (previously, the "Light Street Proposal"). The Light Street Proposal further contemplated expanding the size of the Board to ten seats and the appointment of five of its nominees to the expanded Board, and the formation of a special committee to identify and hire a successor CEO.

138. Light Street's letter to the Board "acknowledge[d] that [their] roles as [directors] have been far more demanding than anticipated as of late" – no doubt in reference to JANA's now withdrawn proxy contest – but warned that it was "no justification to abandon [their] fiduciary responsibilities to the shareholders that [they] serve." Light Street stated that the Merger

"materially undervalue[d] the Company and [was] detrimental to shareholder interests." Light Street further highlighted that "[t]he proposed sale [was] the latest act of mismanagement by the Board [] that has actively worked against shareholder interests," including by "delay[ing] its annual shareholder meeting for months,[] preventing shareholders from selecting a competing slate of board nominees" which "manipulated the makeup of the Board and circumvented our rights as shareholders[.]"

139.    Included with Light Street's letter to the Board was an exhibit with a series of points and analyses that supported its proposal and its "[c]oncerns with Board Actions and the Sale Process[.]" Regarding its "concerns" related to the Board's process (as disclosed in the Proxy), Light Street aptly highlighted that:

> it became clear to us that a series of misaligned actions resulted in a price to Zendesk shareholders that does not reflect fair value nor the future appreciation potential of Zendesk's shares. . . . **We believe that Zendesk embarked upon a strategic review from a position of weakness as a perceived "motivated seller"; a Board and management team that had lost the confidence of shareholders.** Unfortunately, this coincided with increased macroeconomic uncertainty, causing two significant headwinds to the prospects of the Zendesk sale process: (i) many private equity sponsors and their limited partners began slowing or pausing new investments, and (ii) businesses raised the level of scrutiny on new spending, elongating software sales cycles and causing softness in new bookings for many software vendors, including Zendesk. As a motivated seller, we believe insufficient consideration was given to the standalone path forward. Zendesk did not, and does not, have to sell.
>
> ***
>
> We do not expect that Zendesk is immune to the current economic environment and therefore agree that it is reasonable to construct a revised financial case reflecting the impact of a potential recession. Notwithstanding, **we believe the financial model approved by the Board and set forth as the basis for approval of the proposed merger, the [Fairness Opinion Projections], was not constructed to reflect a reasonable financial forecast but rather was an unrealistic forecast constructed to justify a transaction at an unreasonably low price.**

140.    Light Street further outlined specific elements of the Fairness Opinion Projections with which it disagreed, including that they "call[ed] for a stark reduction in the 2023E growth rate versus the March 2022 Case[] (17% growth vs. 27% growth)[,]" that it was "unreasonably punitive in forecasting operating margin in a lower growth environment" and that management "improperly assumed a constant margin profile between the [March 2022 Case and the Fairness

Opinion Projections], completely ignoring the impact of a more prudent cost structure, and yielding lower profitability levels than would reasonably be expected." Finally, Light Street questioned certain "discrepancies" concerning the Financial Advisors' methodology and "finessed" fairness opinions, including the selection and use of certain precedent transactions and comparable companies resulting in **the Financial Advisors' use of lower valuation multiples in their analyses**.

141. Notably, Light Street averred that its proposal would enable Zendesk's then-existing public shareholders to benefit from the Company's long-term value creation plan and potential upside, including "**potentially realizing a share price in excess of $180-200 by the end of 2025.**" On August 29, 2022, Light Street publicly announced the transmission of its letter and proposal, highlighted "that the Proposed [Merger] materially undervalue[d] Zendesk[,]" "outline[d] recent examples of active obstruction of shareholder rights" by the Board, and encouraged shareholders to review its letter to the Board and the analyses provided therein.

142. With a new threat looming, and with personal benefits riding on the Merger with the Consortium, the Board quickly determined, and announced on September 1, 2022, that the Light Street Proposal was "neither a 'Superior Proposal' nor reasonably likely to lead to a 'Superior Proposal' under the terms of [the Merger Agreement]." Over the next several days, the Board and management further campaigned against the Light Street Proposal and in favor of the Merger.

143. Meanwhile, on September 13, 2022, Light Street filed a preliminary proxy statement encouraging shareholders to vote against the then-proposed Merger and highlighting the same issues identified in its letter to the Board.

144. Ultimately, the Board's obstructionist efforts succeeded, and, based on the materially misleading Proxy, on September 19, 2022, shareholders voted in favor of the Merger. Just 76,553,793 of the 123,465,884 shares of common stock entitled to vote were cast in favor of the Merger, based upon the materially misleading Proxy.

86.145.        In shortsum, following a very public rebuke of the Momentive Transaction and in the face of an impending proxy contest, the Board loss (and CEO Svane facing the

44

possibility of a forced resignation without obtaining his Golden Parachute), Defendants succumbed to a ~~Jana~~JANA-forced sale of the Company and then drastically reduced the Company's projections~~,~~ in order to secure ~~a~~ fairness ~~opinion~~opinions and justify the sale of Zendesk ~~at an~~for the unfairly low Merger Consideration ~~that the Board and management knew did not represent the true value of Zendesk~~. By approving the Merger at the inadequate Merger Consideration, the Board succumbed to JANA's threats of a proxy contest in order to protect themselves from being publicly ousted, and CEO Svane protected himself from being forced to resign as CEO without obtaining his Golden Parachute.

**B.** ~~*Zendesk Management*~~ **The Board Took Steps to Ensure ~~the~~ Beneficial Treatment of ~~*Their Own*~~Insider's Equity Awards in the Sale JANA Demanded**

~~87.~~146.    After realizing that either a proxy contest or a sale of the Company was inevitable, Zendesk management took steps to ensure the beneficial treatment of their equity awards.

~~88.~~147.    ~~On~~Specifically, on April 27, 2022~~,~~ – just as the Board was beginning the sales process demanded by JANA – the Board approved and adopted Amendment No. 1 to the Zendesk, Inc. 2014 Stock Option and Incentive Plan (the "Plan Amendment") "to~~;~~ ensure" that the equity awards of "all employees with a title of Vice President and above" would be subject to accelerated vesting in connection with a change of control:

> This is a technical amendment to the Plan that serves to ensure that equity awards will be treated in accordance with the intent and purposes of the Company's existing Acceleration Plan and similar preexisting change in control provisions, including, in connection with an event constituting a change of control as defined under the Acceleration Plan that eligible employees under the Acceleration Plan have the ability to receive the benefits of outstanding awards that are assumed or substituted in any such event and, if certain outstanding awards are not assumed or substituted in such event, certain payments to eligible employees will be made in respect of the cancellation of such awards under the Plan's change in control provisions.

148.    Zendesk's Form 10-K/A, filed on May 2, 2022, ~~discussing~~discussed the Plan Amendment and specifically noted that:
~~89.~~

Mr. Svane's equity awards have previously been subject to double-trigger change in control acceleration provisions pursuant to his grant agreements, which in certain cases pre-date the adoption of the Acceleration Plan and the Plan Amendment. The terms of Mr. Svane's acceleration provisions are consistent with the Acceleration Plan and the Plan Amendment. The Plan Amendment provides that all employees with a title of Vice President and above, including Mr. Svane, will be covered by the terms of the Company's Acceleration Plan. ~~Additionally~~

149.    In other words, once it decided to start a sales process, the ~~Proxy makes clear~~Board made sure that the equity of certain insiders – including Defendant Svane – would immediately vest upon the sale.

~~90.~~150.        Then, following the Consortium's June 21, 2022 "best and final" offer ~~on June 21, 2022, representatives of~~, the Board directed its counsel, Wachtell Lipton ~~and the Consortium's legal counsel, Fried Frank, Harris, Shriver & Jacobson LLP, continued to exchange drafts of the Merger Agreement and the ancillary agreements, and those representatives continued,~~ to discuss the ~~open issues in the agreements, including issues relating to the~~ "treatment of equity awards and other employee matters.~~."~~" with the Consortium's counsel (Fried Frank, Harris, Shriver & Jacobson LLP).

~~91.~~151.        ~~Moreover~~As a result of these discussions, on June 23, 2022, Wachtell Lipton provided a summary of a proposed retention equity award and severance program and, that same day, the Board approved an equity-based retention program pursuant to which certain executives were granted RSU Awards or "Retention Grants~~.~~."

~~92.~~152.        ~~Similarly~~Moreover, in connection with the Merger, the Compensation Committee was permitted to award up to **$30 million in *discretionary* bonuses to employees, including an aggregate of up to $7.5 million to certain executive officers**~~.~~ **other than the CEO (the "Incentive Bonuses")**.

93.    In ~~other words,~~short, once the Board and management ~~knew~~accepted that a sale was inevitable ~~and began taking,~~ they took steps to "ensure" the beneficial treatment of their own equity awards.~~Indeed, in approving~~ and the ~~Merger at the inadequate Merger Consideration, the Board succumbed to Jana's threats~~payment of ~~a proxy contest in order to protect themselves from being publicly ousted,~~Retention Grants and ~~CEO Svane was~~

46

1  ~~specifically protecting himself from~~/or Incentive Bonuses. Indeed, rather than being

2  forced to resign ~~as CEO~~ without obtaining ~~his~~their Golden Parachute~~.~~

3     153.  ~~In an effort to receive the above beneficial treatment~~, CEO Svane and ~~avoid further~~

4  ~~complications with Jana, the Board took advantage~~the rest of the ~~opportunity to sell the Company.~~

5  ~~To ensure the sale, the Board and~~ Company's management~~,~~ were ~~forced to excessively reduce~~

6  ~~the Company's projections (even though they knew it was unwarranted) to~~able to both secure ~~a~~

7  ~~fairness opinion~~their Golden Parachute, equity vesting, and any related Retention Grant, to say

8  nothing of the Incentive Bonuses.[10] According to the Proxy, and ~~justify~~for their part, the

9  ~~sale~~Defendant members of ~~Zendesk at~~the Board received an ~~unfairly low Merger Consideration.~~

10  aggregate of $1.8 million:

11      [T]he estimated aggregate value of the unvested RSU Awards held by Zendesk's

12      nonemployee directors, all of which will become fully vested upon the Effective
    Time and converted into the right to receive the Merger Consideration, is

13      $1,800,000, and they are afforded "single-trigger" treatment.[11]

14  **IV.**  **The False and Misleading Statements in the Proxy**

15     ~~94.~~154.  Having secured a legal shield against claims and benefits for themselves,

16  Defendants misled shareholders. Specifically, in order to convince shareholders to support the

17  Merger, the Board disseminated a false and misleading Proxy, in which Defendants solicited

18  shareholder approval for the Merger~~by filing a false and misleading Proxy with the SEC. This~~

19  The Proxy misled shareholders about Zendesk's value by making false and misleading statements

20  concerning the Fairness Opinion Projections and the value of Zendesk shares.  ~~Specifically,~~

21  ~~Plaintiffs challenge the following statements from the Proxy as false and/or misleading:~~

22     155.  Specifically, the Proxy contained the following materially false and misleading

23  statements:

24       ~~i)~~a.  "Qatalyst Partners was advised by Zendesk management, and Qatalyst

---

[10]  According to the Proxy, and as of the date thereof, "the Compensation Committee ha[d]
not yet determined the amount of discretionary bonuses, if any, that may become payable to any
of the executive officers pursuant to th[e] transaction incentive pool."

[11]  Moreover, Defendant Koplow-McAdams remains an "Independent Board Member" of the
now-private Company.

1   Partners assumed based on discussions with Zendesk management and the Board of

2   Directors, that **the June 2022 Case had been reasonably prepared on bases reflecting**

3   **the best currently available estimates and judgements of Zendesk management of the**

4   **future financial performance of Zendesk** and other matters covered thereby."

5   Proxy at 47.

6   ii)b.    "Goldman Sachs assumed with the consent of the Board of Directors that

7   **the Forecasts were reasonably prepared on a basis reflecting the best then available**

8   **estimates and judgements of Zendesk management**." Proxy at 53.

9   c.    TheThat "in the view of Zendesk management" the "Management

10  Projections" -- which was defined to include the Fairness Opinion Projections – "were

11  reasonably prepared in good faith on a basis reflecting the best available estimates and

12  judgments at the time of preparation, and presented as of the time of preparation", "were

13  prepared on a reasonable basis" and "are based upon a variety of estimates and

14  assumptions" that were "considered reasonable by Zendesk management, as of the date of

15  their preparation." Proxy at 64-65.

16  iii)d.    Zendesk's implied values per share of Zendesk that Qatalyst Partners and

17  Goldman Sachs calculated in support of their respective "fairness" opinions, using the

18  downwardly manipulated Fairness Opinion Projections. Proxy at 46-61.

19  95.    First, the Proxy falsely stated that the Board and management believed that

20  the assumptions Zendesk management used as a basis for creating the severely

21  downwardly-adjusted Fairness Opinion Projections— – which were provided to Qatalyst

22  Partners and Goldman Sachs for use in rendering their fairness opinions— – were

23  reasonable at the time.

24  156.    In March of 2022, and reflected the Company's managementbest estimates of

25  Zendesk management. As outlined above, they were not. Rather, Defendants knew that the

26  Fairness Opinion Projections were unreasonably low, were not prepared the Originalin good faith

27  but rather were prepared solely to procure fairness opinions, and did not reflect management's

28  best estimates and judgments regarding Zendesk's expected financial performance.

48

157.    Defendants knew that there were no meaningful changes to Zendesk's long-term financial prospects or economic conditions between the time they updated the March 2022 Case in May 2022 and the time they created and/or approved the use of the significantly lower Fairness Opinion Projections in June 2022 that legitimately justified the significant reductions. Rather, as noted herein, the eleventh-hour downward revisions to the Company's financial projections, the resulting Fairness Opinion Projections, and the valuations that they implied were contrary to every objective metric of the Company's value and contradicted Zendesk's financial performance and prospects, Goldman Sachs' prior valuation (just months earlier), and the bids received during the process:

a.    The reductions were contrary to the Momentive Transaction Projections and the March 2022 Case, which the Board had updated and confirmed in May 2022, barely a month before the June reductions that resulted in the Fairness Opinion Projections.

b.    As outlined above, the reductions were contrary to the Company's actual results and management's public comments regarding the Company's path forward and "extremely strong foundation for continued long term growth."

c.    The valuations implied by the reduced Fairness Opinion Projections were contrary to Goldman Sachs' own October 2021 valuation of the Company, at which time it valued Zendesk between $130 to $197 per share, **$52.50-$119.50 higher per share** than the Merger Consideration the Board accepted just nine months later.[12]

d.    And the Merger Consideration that the Board accepted based on these reduced projections was contrary to the bids received during the process, which ranged from $120 to $135 per share and which the Board rejected in May 2022 as not actionable.

---

[12]    In connection with the Momentive Transaction, and using the Momentive Transaction Projections, Goldman valued Zendesk from $130 to $197 per share (with a midpoint of $163.50) using a DCF analysis, and from $149 to $212 per share in an illustrative analysis of the implied present value of an illustrative future value per share of Zendesk common stock. By way of comparison, using the Fairness Opinion Projections, Goldman valued Zendesk from just $66 to $116 in its DCF analysis, and $64 to $124 in an illustrative analysis of the implied present value of an illustrative future value per share of Zendesk common stock.

**AMENDED** CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

158.    The timeline of the creation of the Fairness Opinion Projections likewise reveals their falsity:

a.    In October 2021, in connection with the Company's entry into and solicitation of support for the Momentive Transaction, management created the Momentive Transaction Projections, based on which Goldman Sachs valued Zendesk **from $130 to $197 per share (with a midpoint of $163.50)** using a DCF analysis.

b.    In March of 2022, the Company's management prepared the original March 2022 Case, which they then updated and confirmed in May ~~of~~ 2022, to create the March 2022 Case disclosed in the Proxy. The Board approved both the original and the updated March 2022 Case and provided both to bidders.

c.    Then, on June 22, 2022, ~~management presented the~~ barely **one month** after the Board updated and confirmed the March 22 Case, and just days after the Consortium's "best and final offer" of $77.50 per share, management created the Fairness Opinion Projections for the sole purpose of using them to secure a fairness opinion.

d.    On July 28, 2022, Zendesk announced its Q2 2022 results for the quarter ended June 30, 2022, and noted that revenue was $407.2 million for the quarter, an increase of 28% over the prior year period. Zendesk's bookings metrics are directly tied to its revenues.

159.    Simply put, it was wholly unreasonable for the Company's projections to be drastically reduced in June 2022, and Defendants knew that the Fairness Opinion Projections were not reasonably prepared on a good faith basis and did not reflect their own or management's genuine best estimates of Zendesk's expected financial performance.

~~96.    ~~As set forth above, Defendants only downwardly ~~revised June 2022 Case that was approved by the Board for use by the Company's financial advisors in rendering their fairness opinions. However, the Proxy failed to disclose adequate information explaining the significant reductions that were made over the course of management's preparations of these projections – all of which took place over only four months. It is highly unlikely that projections would change that drastically in only four months.~~

1 Furthermore, if there were valid reasons for this change, Defendants would likely have
2 included this information in the Proxy.

3     97.160.     Thus, as set forth above, the Board only downwardly revisedthe March
4 2022 Case to create the Fairness Opinion Projections to justify anthe inadequate Merger
5 Consideration from the Consortium, *following* a very public rebuke of the Momentive
6 Transaction and in the face of an impending proxy contest from JanaJANA, where the Individual
7 Defendants were facing public ouster, and where Defendant Svane was facing the possibility of
8 his forced resignation as CEO without obtaining his Golden Parachute.

9     98.161.     Defendant Svane and Company management created the Fairness Opinion
10 Projections based on artificialfalse assumptions that were inconsistent with their own publicly
11 expressed optimism regarding Zendesk's future. The Board was aware (i) that the Fairness
12 Opinion Projections were created at their request; (ii) of the content of the Company's financial
13 results and management's optimistic public statements; (iii) that that the downwarddownwardly
14 revised Fairness Opinion Projections contradicted these optimistic statements; and (iv) that that
15 the downwarddownwardly revised Fairness Opinion Projections needed to bewere created to
16 justify a fairness opinion. The downward revisions were thus intended to reduce the Company's
17 appraised value – not create projections that were more reflective of the Company's financial
18 reality. and prospects. In short, the BoardDefendants did not believe that the Fairness Opinion
19 Projections were based on management's best estimates of the Company's future performance,
20 as they stated in the Proxy.

21     162.     Second, the values per share of Zendesk common stock resulting from Qatalyst
22 Partners' Qatalyst's and Goldman Sachs' analyses were false and misleading, because the
23 valuations were based upon the inaccurate, objectively unreasonable, downwardly-revised
24 Fairness Opinion Projections that, which were only created to bring downfor the sole purpose of
25 lowering the Company's implied value. As explained above, Qatalyst Partners' and Goldman
26 Sachs' respective discounted cash flow analyses of Zendesk are the most material analysis that a
27 banker can perform in valuing a company. These valuations, although swaddled with boilerplate
28 disclaimersthe fairness opinions.

163.    Qatalyst Partners' Discounted Cash Flow Analysis and Selected Companies Analysis were both heavily dependent upon the unreasonably low Fairness Opinion Projections, and ~~provisos, fundamentally asserted that Qatalyst Partners valued Zendesk stock at $~~thus the resulting implied valuation ranges for each analysis set forth on pages 48-49 of the Proxy ($58.27 to $96.42 ~~per share~~under the DCF Analysis, and ~~that Goldman Sachs valued Zendesk stock at $~~$47.29 to $91.92 under the Selected Companies Analysis) were deceptively low and misled shareholders regarding the fair value of their shares.

164.    Similarly, Goldman Sachs' Illustrative Discounted Cash Flow Analysis and Illustrative Present Value of Future Share Price analysis were both heavily dependent upon the unreasonably low Fairness Opinion Projections, and thus the resulting implied valuation ranges for each analysis set forth on pages 55-56 of the Proxy ($66 to $~~166 per share (rounded~~116 under the DCF Analysis, and $58 to ~~the nearest dollar). However, these valuations~~$119 under the Present Value of Future Share Price Analysis) were deceptively low and misled shareholders regarding the fair value of their shares.

~~99.~~165.        These valuations were false and misleading because their most crucial ~~input~~ source – the Fairness Opinion Projections ~~casted~~ – were false and misleading and cast a much more pessimistic outlook on the Company's value than ~~actual~~ reality. ~~Accordingly, the~~The resulting false and misleading equity reference ranges induced shareholders to sell their stock at less than fair value.

**V.    Zendesk Shareholders Suffered Financial Harm ~~as~~As a ~~result~~Result of the False and Misleading Proxy**

~~100.~~166.        The Proxy caused Zendesk's stockholders harm by inducing them to accept a Merger Consideration that undervalued ~~the Company, and therefore failed to compensate stockholders for the inherent value of their shares.~~their shares. Moreover, since the Merger could not have occurred without the approval of Company shareholders, the Proxy was an essential link in the accomplishment of the sale~~,~~ and the misleading statements were the cause of the ~~Class'~~Class's economic loss.

167.    First, the Merger Consideration was ~~63~~53% below Goldman Sachs' October 2021 midpoint of $163.50 per share valuation of the Company.

~~101.~~    Second, the Merger Consideration was 39% to ~~70~~41% below the original offer ~~of $127 to $132 per share~~ made by the Consortium in February 2022~~.~~

~~102.~~168.    ~~In~~ of $127.000 to $132.00 per share. The Consortium's February 2022 offer was in line with Goldman Sachs' $130.00 to $197.00 per share valuation of Zendesk in connection with the Momentive Transaction, which valuation was given less than four months prior to the Consortium's February 2022. Offer. What is more, in rejecting the Consortium's February 2022 offer, the Board stated that the offer ~~that~~ – which **was nearly double the Merger Consideration** ~~"~~ – "significantly undervalued Zendesk and that it was not in the best interests of Zendesk and its stockholders to alter Zendesk's existing strategic plan~~"~~."

~~103.    Yet, the Consortium's February 2022 offer was in line with Goldman Sachs' fairness opinion in relation to the Momentive Transaction from only a month prior, whereby Goldman Sachs valued Zendesk at **between $130.00 to $197.00 per share** based on a discounted cash flow analysis.~~

169.    ~~Second~~Third, the Merger Consideration was approximately **35% to 43% below** the early May 2022 offers made by the Consortium ($120 per share) and Bidder 2 ($125 to $135 per share) and **20% to 22% below** the late May 2022 offers made by the Consortium ($96 per share) and Bidder 2 ($90 to $100 per share), all of which the Board rejected as not "actionable," and after which the Board publicly concluded that it was in shareholders' best interests to terminate the sales process and continue executing Zendesk's plan as a stand-alone public company.

170.    Fourth, as described above, the Merger Consideration is contrary to the Company's actual results and management's statements:

~~104.~~a. Additionally, on July 28, 2022, ~~only about one~~barely a month after management prepared the pessimistic ~~June 2022 Case~~Fairness Opinion Projections, Zendesk announced that Q2 2022 revenue had *increased* 28% year-over-year to $407.2 million, and Q2 2022 non-GAAP operating income was $23.6 million. Both ~~of these~~

1    ~~numbers~~metrics were at the high end of the Company's guidance provided on the Q1 2022

2    Earnings Call held on April 28, 2022.

3        ~~105.~~b.  Moreover, in Q2 2022, non-GAAP gross margin improved one percentage

4    point (from 81% to 82%) from the year prior, and free cash flow margin improved to 10%

5    during the quarter from 7% from the year prior.

6        ~~106.~~  ~~To summarize~~In other words, just one month after Zendesk management drastically

7    lowered the projected growth of the Company in the June 2022 Case, that same management

8    reported strong growth in Zendesk's public filings.

9        ~~107.~~171.        ~~Additionally~~Fifth, financial commentators reported that Zendesk's stock

10    had the potential to rise in value if the Company continued to grow revenue above 20% for several

11    more years with operating and free cash flow margins continuing to expand.

12        172.    ~~Therefore~~Sixth, as stated in Light Street's publicly disclosed letter to the Board and

13    preliminary proxy, even utilizing Zendesk's "conservative, [B]oard approved [Fairness Opinion

14    Projections] revenue and apply[ing] an illustrative margin profile achievable through a focus on

15    profitable growth" as proposed by Light Street, Light Street "expect[s] Zendesk stockholders to

16    generate an attractive return of approximately 2.5x their money and 35% IRR **[or a per share**

17    **price of $193]** between now and the end of 2025 based on a 20.0x EBITDA multiple on 2026E

18    EBITDA"[13]:

19



Illustrative Standalone Case Price Target @ 12/31/2025

| | | | | | |
|---|---|---|---|---|---|
| 2026E EBITDA | $1,101 | Existing Common Equity | | | 62.9 |
| EBITDA Multiple | 20.0x | New Preferred Equity | | | 24.2 |
| Enterprise Value | $22,013 | 2023 Notes (Converted) | | | 2.4 |
| (less): Net Debt | ($119) | 2025 Notes (Converted) | | | 10.6 |
| Equity Value | $21,893 | RSUs | | | 11.0 |
| *FDSO* | 113.5 | Options (TSM) | | | 2.5 |
| Share Price | $193 | Total FDSO | | | 113.5 |
| *Vs. Current $77.50* | 2.5x | | | | |

| Exit Returns Sensitivity | **15.0x** | **17.5x** | **20.0x** | **22.5x** | **25.0x** |
|---|---|---|---|---|---|
| Implied Exit EBITDA / Growth Multiple | 0.72x | 0.84x | 0.96x | 1.08x | 1.20x |
| Implied Exit Revenue Multiple | 4.3x | 5.0x | 5.8x | 6.5x | 7.2x |
| Implied Exit Revenue / Growth Multiple | 0.21x | 0.24x | 0.28x | 0.31x | 0.34x |
| Share Price | $145 | $169 | $193 | $217 | $241 |
| MOIC | 1.9x | 2.2x | 2.5x | 2.8x | 3.1x |
| IRR | 23.1% | 29.6% | 35.9% | 40.9% | 45.9% |

\* $ in millions.

---

[13]    Light Street noted that it "believe[s] that 20.0x next twelve months ("NTM") EBITDA is a fair and conservative estimate based on the historical trading ranges of the mature selected public companies[] used by Qatalyst in its fairness opinion, which have traded at an average of 28.4x NTM EBITDA and over 24.6x NTM EBITDA on a trailing five and ten year basis, respectively, and which collectively currently trade at an average of 20.1x NTM EBITDA."

~~AMENDED~~ CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

173.   In sum, if Company shareholders had been informed of Zendesk's true value at the time of the Merger, the Board would have been unable to obtain a fairness opinion from Qatalyst Partners and Goldman Sachs, and Zendesk's shareholders would not have voted to approve the Merger at the Merger Consideration of $77.50. ~~Furthermore~~

~~108.~~   What is more, the Individual Defendants' conduct caused Company shareholders to lose out on alternative options that offered greater value, including independently growing the Company or seeking better offers from alternative bidders that would have allowed shareholders (and not just Company management) to profit.

~~109.~~174.     For example, Light Street ~~Management ("Light Street")~~, which owned more than 2% of Zendesk, proposed a recapitalization of the business, consisting of a $2 billion preferred equity investment arranged by Light Street and a $2 billion incremental debt facility. Together with $1 billion of cash from the balance sheet, Light Street proposed Zendesk conduct a $5 billion tender offer at $82.50 per share, resulting in a 6% increase from the Merger Consideration.

175.   Finally, as a result of the materially false and misleading Proxy, Zendesk shareholders were deceived into foregoing their appraisal rights under Delaware law.  If the Proxy had not deceived shareholders regarding the Company's fair value and the reasonableness of the Company's projections, a sufficient number of shareholders would have elected to exercise their appraisal rights under Delaware law, and would have received more than the $77.50 Merger Consideration in an appraisal, as the Company's fair value exceeded the Merger Consideration.

~~110.~~176.     Accordingly, Zendesk shareholders suffered ~~damages in the amount of the difference between the Merger Consideration and the fair value of their shares as calculated in accordance with recognized methods of valuation~~economic loss as a result of the materially false and misleading Proxy.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 ~~and 17 C.F.R. § 244.100~~ Promulgated Thereunder)**

1    ~~111.~~178.    Plaintiffs incorporate each and every allegation set forth above as if fully

2    set forth herein.

3    ~~112.~~178.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by

4    the use of the mails or by any means or instrumentality of interstate commerce or of any facility

5    of a national securities exchange or otherwise, in contravention of such rules and regulations as

6    the Commission may prescribe as necessary or appropriate in the public interest or for the

7    protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent

8    or authorization in respect of any security (other than an exempted security) registered pursuant

9    to section 78l of this title."  15 U.S.C. § 78n(a)(1).

10    ~~113.~~179.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the

11    Exchange Act, provides that proxy communications shall not contain "any statement which, at

12    the time and in the light of the circumstances under which it is made, is false or misleading with

13    respect to any material fact, or which omits to state any material fact necessary in order to make

14    the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

15    ~~114.~~180.    The omission of information from a proxy will violate Section 14(a) and

16    Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

17    ~~115.~~181.    Defendants issued the Proxy to solicit Zendesk shareholders' support for

18    the Merger. Each of the ~~Individual~~ Defendants reviewed and authorized the dissemination of the

19    Proxy, which misrepresented and omitted the above-referenced material information, which in

20    turn rendered the above-referenced sections of the Proxy materially false, misleading, and

21    incomplete~~.~~ because such sections provided a false, misleading, and incomplete valuation picture

22    of Zendesk. The Proxy contained untrue statements of fact and/or omitted material facts

23    necessary to make the statements made not misleading.

24    ~~116.~~182.    Each of the Individual Defendants, by virtue of their roles as officers and/or

25    directors of Zendesk were aware of the Zendesk valuation information but failed to ensure such

26    information was disclosed in the Proxy in a non-misleading fashion, in violation of Section 14(a)

27    and Rule 14a-9. The Individual Defendants knew that the Proxy was materially false, misleading,

28    and incomplete in regard to the above-referenced material information. The Individual

1  Defendants reviewed and relied upon the material information identified above in connection

2  with their decision to approve and recommend the Merger; indeed, the Proxy states that Qatalyst

3  Partners and Goldman Sachs reviewed and discussed their financial analyses with the Board, and

4  further states that the Board considered both the financial analyses provided by Qatalyst Partners

5  and Goldman Sachs as well as their fairness opinions and the assumptions made and matters

6  considered in connection therewith. Further, the Individual Defendants were privy to and had

7  knowledge of the true facts concerning the process resulting in the Merger, and knew that

8  Zendesk's true value that exceededwas far greater than the Merger Consideration.

9      117.183.    The Individual Defendants knew that the material information identified

10  above had been misrepresented and/or omitted in the Proxy, rendering the sections of the Proxy

11  identified above to be materially false, misleading, and/or incomplete. Indeed, the Individual

12  Defendants were required to review Qatalyst Partners'Qatalyst's and Goldman Sachs' valuation

13  analyses, question Qatalyst Partners and Goldman Sachs as to their derivation of fairness, and be

14  particularly attentive to the procedures followed in preparing the Proxy and review it carefully

15  before it was disseminated, to corroborate that there were no material misstatements or omissions.

16  After reviewing both the underlying materials and the Proxy, the Individual Defendants failed to

17  provide a non-misleading proxy solicitation.

18      118.184.    Each of the Individual Defendants was responsible for ensuring that the

19  Proxy was not misleading, but failed to do so.

20      119.185.    Zendesk is also liable for violation of Section 14(a) of the Exchange Act as

21  the issuing entity of the Proxy and by virtue ofbased on the Individual Defendants' violations of

22  the Exchange Act.

23      120.186.    The above-referenced information was material to Plaintiffs and the Class,

24  who were deprived of their right to cast an informed vote because such misrepresentations and

25  omissions were not corrected prior to the Shareholder Vote, and thus rendered the above-refenced

26  sections of the Proxy materially false, misleading, and incomplete.

27      121.187.    As a direct and proximate result of the dissemination of the materially false,

28  and misleading, and incomplete Proxy that Defendants used to obtain shareholder approval of the

Merger, Plaintiffs and the Class suffered damages and actual economic losses (*i.e.*, the difference between the Merger Consideration and the true value of their shares at the time of the Merger and/or the value that shareholders would have received via the alternatives to the Merger) in an amount to be determined at trial. By reason of the misconduct detailed herein, Defendants are liable pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9.

## **COUNT II**

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

122.188.    Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

123.189.    The Individual Defendants acted as controlling persons of Zendesk within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Zendesk, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false, misleading, and incomplete statements contained in the Proxy filed with the SEC, the Individual Defendants had the power to influence and control—and did influence and control—directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are materially false, misleading, and incomplete.

124.190.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

125.191.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of the Board to approve the Merger. They were thus directly involved in preparing this document.

126.192.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in (i) negotiating, reviewing, and/or approving the Merger. and (ii) preparing, reviewing, and/or approving the Fairness Opinion Projections. The Proxy described describes the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

127.193.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

128.194.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' conduct, Plaintiffs and the Class have suffered damages and actual economic losses (i.e., the difference between the Merger Consideration and the true value of their shares at the time of the Merger and/or the value that shareholders would have received via the alternatives to the Merger) in an amount to be determined at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment and relief as follows:

A.a.    Declaring that this action is properly maintainable as a Class action Action and certifying Plaintiffs as Class Representatives Representative and their counsel as Class Counsel;

B.b.    Awarding Plaintiffs and the Class all damages sustained as a result of Defendants' wrongdoing, including but not limited to compensatory damages, rescissory damages, and quasi-appraisal damages, plus pre-judgment and post-judgment interest;

c.    Awarding Plaintiffs and the Class the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

C.d.    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

1    ~~D.~~c.    Granting such other and further relief as this Court may deem just and proper.

2    **JURY DEMAND**

3    Plaintiffs demand a trial by jury on all issues so triable.

4    ~~DATED: March 17, 2023~~

5    Dated: August 11, 2023                 Respectfully submitted,

6                                           *-/s/ Juan E. Monteverde*

7    **OF COUNSEL**                         Juan E. Monteverde (NY Reg. No. 4467882)

                                            **MONTEVERDE & ASSOCIATES PC**
8    ~~**MONTEVERDE &**~~                   Juan E. Monteverde (*pro hac vice*)
     ~~**ASSOCIATES PC**~~                  Rossella Scarpa (*pro hac vice*)
9    ~~Juan E. Monteverde~~                 The Empire State Building
     ~~Rossella Scarpa~~                    350 Fifth Avenue, Suite 4405
10   ~~The Empire State Building~~          New York, NY 10118
11   ~~350 Fifth Avenue, Suite 4405~~       Tel: (212) 971-1341
     ~~New York, NY 10118~~                 Email: jmonteverde@monteverdelaw.com
12   ~~Tel: (212) 971-1341~~                        rscarpa@monteverdelaw.com
     ~~Fax: (212) 202-7880~~
13   ~~jmonteverde@monteverdelaw.com~~      David E. Bower
14   ~~rscarpa@monteverdelaw.com~~          ~~David E. Bower,~~ SBN 119546
15   *~~Counsel for Plaintiff Brian Bailey~~* **MONTEVERDE & ASSOCIATES PC**
                                            600 Corporate Pointe, Suite 1170
16   **KAHN SWICK & FOTI, LLC**            Culver City, CA 90230
     Michael J. Palestina (*pro hac vice*)  Tel: (310) 446-6652
17                                          ~~Fax: (212) 202-7880~~
     1100 Poydras Street, Suite ~~3200~~960 ~~dbower@monteverdelaw.com~~
18   New Orleans, LA 70163
19   Tel: (504) 455-1400                    Email:  dbower@monteverdelaw.com
     Direct: (504) 648-1843
20   Fax: (504) 455-1498                    *Counsel for Co-Lead Plaintiffs and*
     ~~Email:~~michael.palestina@ksfcounsel.com *Co-Lead Counsel for the Putative Class*
21   brian.mears@ksfcounsel.com
22   *Counsel for ~~Plaintiff Scott Franklin~~Co-*
     *Lead Plaintiffs and*
23   *Co-Lead Counsel for the Putative Class*

24

25

26

27

28

AMENDED **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**